**UNITED STATES of America, Plaintiff,**

v.

**SHELL OIL COMPANY,
et al., Defendants.**

**No. CV 91–0589–RJK.**

United States District Court,
C.D. California.

Aug. 11, 1998.

Lois J. Schiffer, Assistant Attorney General, Environment & Natural Resources Division, Joshua M. Levin, Michael J. Zevenbergen, Washington, DC, Nora M. Manella, United States Attorney, Leon W. Weidman, Assistant United States Attorney, John Rubiner, Assistant United States Attorney, Los Angeles, CA, for plaintiff U.S.A.

Daniel E. Lungren, Attorney General of California, Roderick E. Walston, Chief Assistant Attorney General, Theodora Berger, Assistant Attorney General, Timothy R. Patterson, Deputy Attorney General, San Diego, CA, for plaintiff State of California.

Munger, Tolles & Olson L.L.P., Ronald L. Olson, Peter R. Taft, Cynthia L. Burch, Los Angeles, CA, for Defendants.

### MEMORANDUM OF DECISION AND ORDER

KELLEHER, District Judge.

The Court has presented for adjudication the question of the allocation of liability for the cost of cleanup of the McColl Superfund Site, a significant and deleterious by-product of the World War II aviation gasoline program. The United States of America ("the Government") has incurred substantial response costs in its attempts to clean up the McColl Site and seeks by this action to recover those costs from Shell Oil Company, Union Oil Company, Atlantic Richfield Company, and Texaco, Inc. (herein referred to as "Shell," "Union," "ARCO," and "Texaco," respectively and "the Oil Companies," collectively). Recovery is sought pursuant to Section 107 of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 ("CERCLA"), Pub.L. No. 96–510, as amended by the Superfund Amendments and Reauthorization Act of 1986 ("SARA"), Pub.L. 99–499, codified at 42 U.S.C. § 9607.

This Court has previously granted summary judgment holding both the Government and the Oil Companies liable as "arrangers" as this term is used in 42 U.S.C. § 9607. *See U.S. v. Shell Oil Co.*, 841 F.Supp. 962, 975 (C.D.Cal.1993) (holding Oil Companies liable); September 18; 1995, Order (holding Government liable).

Having found both the United States and the Oil Companies liable, all that remains is a determination, pursuant to 42 U.S.C. § 9613, of the proper allocation of response costs between the Government and the Oil Companies. The Court needs to determine only the percentage of liability allocable to the Government and the percentage of liability allocable to the Oil Companies.[1] The allocation

---

1. The Court need not determine the total amount of response costs nor determine the percentage of liability allocable to each individual company, as the Oil Companies have reached an agreement as to how their liability will be apportioned among them.

issue was tried to the Court on February 17, 18, 19, 20, 23 and 24, 1998. Post-trial briefs were filed on April 2, 1998, and the matter stood submitted at that time.

There is presented the task of deciding and determining a factual issue in a manner different from any previously encountered by this Court. The difference arises from the unique and unusual discretion reposed in this Court by statute, which provides in relevant part:

> In resolving contribution claims, the court may allocate response costs among liable parties using such equitable factors as the court determines are appropriate.

42 U.S.C. § 9613(f)(1).

Courts have consistently recognized the broad discretion afforded by this statute to the District Court both in the selection of equitable factors to be applied and in the application of those factors. In *United States v. R.W. Meyer, Inc.*, 932 F.2d 568 (6th Cir.1991), the court noted:

> Congress reemphasized that the trial court should invoke its moral as well as its legal sense by providing that the court use not just 'equitable factors,' which phrase already implies a large degree of discretion, but 'such equitable factors as the court determines are appropriate.' This language broadens the trial court's scope of discretion even further.

*Id.* at 572.

Thus, the Court finds itself in an unusual position—it is to act not only as a discretionary finder of fact but as a "finder of law" in a manner different from any usually required of a judicial officer acting in a non-jury proceeding insofar as the Court must choose which equitable factors are applicable to this case.

It is appropriate to consider early on the meaning, significance and proper application of the Court's function in these circumstances. This function is something other, different and more than the mere application of the rules of contract law to uncontested facts (as is largely the case here). In one sense, this case requires this court to determine in an unusual manner the rights, duties and obligations *inter se* of parties to a contract. But the problem is not that simple. In the fullest sense the Court is here faced with an unusual contract entered into in unusual times for unusual purposes under drastically different circumstances. The Court must here decide the relative obligations between the parties to a contract which is silent on the question here presented. Indeed, the question presented arises because of liability imposed by a statute enacted long after the contract was entered into and more than a generation after the contract was fully performed.

This is a case in which the Court is required to take a long delayed hindsight view and make an appraisal of what was done to win a war. The Court is not to determine how well it was done, nor who deserves praise or criticism for what was done—it was done magnificently. We won the war, and what was here done was essential in that accomplishment. This is a case in which allocating "fault" as such is inappropriate. No one was at fault. Each party did what was necessary to achieve a common, paramount goal: victory in World War II. Nevertheless, this matter calls for the allocation per statute of responsibility for the cleanup of the McColl Site.

## BACKGROUND

The McColl Superfund Site comprises roughly twenty-two acres in Fullerton, California. The hazardous waste located at the McColl Site consists primarily of acid sludge byproducts resulting from alkylation and other acid treating processes used in the manufacture of 100–octane aviation gasoline ("avgas") and other refinery products during World War II. During the war, the Oil Companies produced avgas, the most critically needed refinery product for the war effort, in extraordinary quantities at the demand of, and in fulfillment of contracts with, the Government. As noted above, these contracts were silent on the question of who should bear the burden of waste treatment.

### The wartime economy

A survey of the relevant legislative enactments and Executive Orders of the time shows the degree of control exercised by the Government over the wartime economy gen-

erally and the petroleum industry specifically.

In May 1940, a National Defense Advisory Commission ("NDAC") was established to render non-binding advice on procurement policy. The NDAC was succeeded in 1941 by the Office of Production Management ("OPM"), which established an early priorities system to expedite delivery of essential materials to the Army and Navy. In August 1941, the Supply Priorities and Allocation Board ("SPAB") was established to coordinate scarce material deliveries among competing agencies of the United States.

Shortly after the December 7, 1941, bombing of Pearl Harbor by the Japanese, Congress enacted the First War Powers Act "to expedite the prosecution of the war effort," 55 Stat. 838, 839 (1941) (codified at 50 U.S.C.App. § 611 (repealed 1966)). This Act gave broad power to the President to issue Executive Orders concerning the war effort.

In January 1942, President Roosevelt issued Executive Order 9024, which established the War Production Board. Pursuant to Executive Order 9024, the Chairman of the WPB was empowered to issue directives to industry in connection with war procurement and production, including directives with respect to purchasing, contracting, specification, construction, requisitioning, plant expansion, conversion and financing. At this time, the OPM and SPAB were eliminated and their duties were consolidated within the WPB. A subsequent order, Executive Order 9040, conferred upon the WPB the powers previously delegated to the Office of Production Management ("OPM") which, under Executive Order 8629, included the authority to "[f]ormulate and execute in the public interest all measures needful and appropriate in order ... to increase, accelerate, and regulate the production and supply of materials, articles and equipment and the provision of emergency plant facilities and services required for the national defense" [2] and to "[f]ormulate plans for the mobilization for defense of the production facilities of the Nation, and to take all lawful action necessary to carry out such plans." The WPB's

task was principally accomplished through use of intricate nationwide priority rankings system, under which the WPB reviewed requirements for goods appearing to be scarce, determined how much of each product or raw material was needed, and identified facilities to help meet this demand. Facilities were required to give priority to military contracts, and the President was authorized to regulate the flow of scarce raw materials where the use of such materials for national defense resulted in a supply shortage.

Under Executive Order 9040, the WPB was delegated the authority vested in the President of the United States by Section 120 of the National Defense Act of 1916, ch. 143, 39 Stat. 213 (1916), previously conferred upon OPM under Executive Order 8629, to seize the plants which did not comply with production orders and to enforce production orders under threat of criminal penalties.

The WPB's authority was again expanded by Executive Order 9125, which delegated to the WPB the powers vested in the President by Title III of the Second War Powers Act, ch. 199, 56 Stat. 176 (1942). This act, passed in March 1942, authorized the WPB to allocate not just "materials" deemed to be in scarce supply, but "facilities" as well. Additionally, the WPB could require a company to produce a good needed for the war effort where it was within the company's physical and technical capacity to do so. Executive Order 9125 provided that the Chairman of the WPB could exercise "the powers, authority, and discretion conferred upon him by this and any other Order through such officials or agencies ... and in such manner as he may determine."

Additionally, there was a regulatory framework in place that specifically governed the petroleum industry. The United States set up the Office of Petroleum Coordinator for National Defense ("OPC") in May 1941 under the President's constitutional powers as Commander in Chief of the Army and Navy.[3] The OPC's early authority was limited to the issuance of "Recommendations." In practice, as far as allocation of materials was concerned, the OPC and the OPM (later, the

---

2. To this end, the WPB maintained a short list of critical war products that were essential for combat activity. Avgas was on that list for the entire war.

3. Not until after the end of World War II was there a separate entity known as the Air Force. During all times here involved, the Army and the Navy each had its own aerial combat units.

WPB), instituted a procedure by July 1941 whereby the OPC made priority determinations as to supplies for the petroleum industry and as to requirements for petroleum.

On December 2, 1942, President Roosevelt issued Executive Order 9276, which established the Petroleum Administration for War ("PAW"), a successor to the OPC, "in order to coordinate and centralize the war policies and actions of the Government relating to petroleum with a view toward providing adequate supplies of petroleum for the successful prosecution of the war and for other essential purposes." The order provided for the appointment of a Petroleum Administrator whose duties included, *inter alia,* "establish[ing] basic policies and formulat[ing] plans and programs to assure for the prosecution of the war the conservation and most effective development and utilization of petroleum in the United States and its territories and possessions," and "issu[ing] necessary policy and operating directives to parties engaged in the petroleum industry," provided that no directive of the Administrator conflict with any direction issued by the Chairman of the War Production Board.

Thus, the petroleum industry was subject not only to the general oversight of the WPB, which set policy for and issued mandatory regulations for the acquisition and disposition of scarce materials, but to the more specific oversight of the PAW, which instituted a petroleum blending program under which it dictated the quantity and quality of avgas and required quarterly inventory reports from all refineries, authorized purchase of certain quantities of raw materials, and instructed refineries with respect to manufacturing specifications. The purpose of the these actions was to maximize the amount of avgas available to the Government for purchase in order to pursue the war effort.

Throughout the war, policies and directives issued by the PAW remained technically subject to the review and approval of the WPB, but, in practical effect, the PAW's authority as an allocation agency was all but co-equal

with the WPB. Indeed, with respect to some raw materials (such as sulfuric acid for alkylation), the authority of the WPB and the PAW overlapped.

Suffice it to say, the petroleum industry was essentially required to cooperate with the Government in providing essential resources to support our fighting forces and was subject to pervasive oversight by the WPB, PAW and other agencies of the federal Government. Under the wartime regulatory regime, the WPB could compel a refinery to maximize its existing capacity to produce avgas if that refinery had the ability to manufacture avgas. If the company refused to cooperate with the WPB or PAW, it would have been subject to takeover, and individuals who interfered with the Government's regulation of industry and acquisition of supplies would have been subject to criminal prosecution.[4]

The existence of an extensive degree of oversight of the petroleum industry and its avgas program by the Government is corroborated by thousands of pages of deposition testimony and documentary evidence submitted in this case and simply cannot be disputed.

It is at least of passing interest to note that this total and pervasive degree of oversight and control was exercised by the executive branch of the Government. It was at all times the statutorily conferred power of the President that was exercised. In addition to this power, the President as Commander in Chief of the Army and Navy exercised his constitutionally granted power to run the war. It was he who decided that we should build and send to war thousands of fighting aircraft. It was he who announced in his 1942 State of the Union Address that the United States would build 45,000 fighting aircraft in 1942.[5]

Despite the wartime circumstances and the attendant oversight of the Oil Companies by the Government, the relationship between the Government and the Oil Companies was a contractual one. The Government employed the Defense Supplies Corporation

---

4. For example, when a rent dispute threatened to shut down 16,000 to 18,000 barrels a day of avgas production at a Cities Service refinery in 1945, the Government promptly seized the refinery in order to protect avgas production.

5. In actuality, approximately 25,000 combat aircraft were constructed during 1942, and approximately 57,000 more were built in 1943.

("DSC") to finance alkylation facilities and to enter into three-year supply contracts for the purchase of avgas on behalf of the military. These three-year contracts were used both as financial incentives for building new facilities and to establish a centralized purchasing program over the entire output of avgas. These contracts were of the "cost-plus" variety, meaning that the Government would reimburse the Oil Companies for all the costs of avgas production plus a small profit, typically between 6 and 7 percent of costs. Thus, different prices were paid to different avgas manufacturers, depending on the costs of production. These prices were negotiated individually with each refiner after the submission of detailed production costs by the refiner. Each of the Oil Companies entered into one or more such contracts with the DSC.

Integral to the success of the avgas program was the Aviation Gas Reimbursement Plan ("AGRP"). The AGRP was a response to the Government's recognition that the rapid expansion of avgas production would require manufacturers to undertake extraordinary modes of operation which were often uneconomical and unanticipated at the time of the refiners' entry into their avgas contracts. Among the activities for which reimbursement could be sought under the AGRP were the shifting of gasoline components from refineries to others better able to utilize them, the readjustment of plant facilities and equipment, production of goods whose specifications were frequently and uneconomically changed by the military, and the use of cumene to meet new specifications or to increase production from existing components. The AGRP provided that the Government would compensate refiners directly, and fully, for extraordinary expenditures in connection with these activities. These reimbursements were paid to permit maximum production and utilization of avgas, irrespective of cost, and to shift the burden of unforeseen losses from the Oil Companies to the Government.[6]

The Government's constantly growing demand for avgas became so great that the Oil Companies were hard pressed to meet that demand. Production increased from 40,000 barrels per day in December 1941 to 514,000 barrels per day in 1945. In order to meet demand, the Oil Companies were required to increase greatly their use of sulfuric acid, albeit not quite as dramatically as the production numbers might seem to indicate.[7] As a byproduct of the enormous volume of fuel produced and acid used, the Oil Companies were confronted with quantities of spent alkylation acid and acid sludge that were too great to be reused, treated or disposed of under then-existing circumstances.[8] With at least tacit approval from the Government, the Oil Companies contracted with Eli McColl to transport waste away from their refining facilities and dump it at the McColl Site.[9] This dumping began in June 1942 and continued until September 1946.

### Avgas production and avgas waste

There were three types of waste dumped at the McColl site: (1) acid sludge from benzol production; (2) other acid sludge; and (3) spent alkylation acid. In a contract separate from the avgas program, Shell manufactured benzol for the Government. This process yielded acid sludge. The Government does not contest its liability for the benzol waste, which makes up between 5 and 6 percent of the waste at the McColl Site.

The other two types of waste can be traced to the production of avgas. To meet the exacting octane and volatility requirements of the high-compression aircraft engines used at the time, the Oil Companies [10] would blend several different elements to create the special fuel used in our nation's high-perfor-

6. Indeed, the parties have stipulated that this was explicitly stated by PAW Administrator Ickes, who noted: "I know that maximum production may often result in uneconomic operations, but the provisions of the Aviation Gasoline Reimbursement Plan have been designed to permit Government to assume the burden of any such losses."

7. The increase in sulfuric acid use was five-fold.

8. Prior to World War II, waste had been transported to and acceptably disposed of at other sites.

9. On June 8, 1942, Eli McColl obtained a permit from the City of Fullerton to dump acid sludge at the McColl Site. It is undisputed that the dumping was legal at the time.

10. Each of the Oil Companies named as parties operated one or more refineries in the vicinity of

mance aircraft in World War II. The first element was aviation base stock, which was similar to normal motor gasoline and composed 40 to 50 percent of avgas. Also added were iso-pentane, cumene and tetra-ethyl lead. These components made up between 10 and 35 percent of avgas. The final element (and the most important for purposes of this proceeding) was alkylate, which was produced by a process known as alkylation and composed 25 to 40 percent of avgas. Alkylation involved combining molecules of lighter weight petroleum fractions to produce iso-octane. The most efficient method of producing alkylate was to mix iso-butane with butylene in the presence of 98 percent sulfuric acid.[11] This process yielded the alkylate and a by-product of 89 percent spent alkylation acid.

The spent alkylation acid was put to several productive uses by the Oil Companies. One such use was the acid treatment of avgas base stocks to remove sulfur compounds and thus improve the quality of the stocks. Another was the acid treatment of certain components before they entered the alkylation process in order to remove impurities and improve their quality. Additionally, the spent alkylation acid was used by the Oil Companies in the manufacture of other, non-avgas products. All of these uses of the spent alkylation acid produced acid sludge.

Thus, from the time it entered the refinery as "fresh" 98 percent sulfuric acid until its departure in the form of acid sludge, the acid could perform two functions: (1) alkylation, which would turn the acid into 89 percent spent alkylation acid and (2) acid treating of avgas components or other refinery products, which would transform the 89 percent spent alkylation acid into acid sludge. However, the quantity of spent alkylation acid on hand would, at times, exceed (often greatly) the amount that could be used for acid treating. This resulted in the dumping of 89 percent spent alkylation acid before it was used for acid treating.

Wilmington, California, for the production of, among other things, avgas.

**11.** Sulfuric acid is used by refineries primarily as a catalyst or for treatment of product. Generally, it is not incorporated into products leaving the refinery. Thus, virtually all of the acid com-

### ANALYSIS

As far as the application of relevant equitable factors is concerned, there are two determinations to be made that are of obvious and overriding importance: (1) the percentage of the McColl Site waste attributable to the avgas program; and (2) the percentage of that waste for which each party is responsible.

The first inquiry seeks to do by reason that which cannot be done by scientific trial; namely, to take a teaspoon, scoop up a measure of sludge and, through analysis of the sample, determine what percentage of the sludge in that teaspoon is avgas sludge.

The second inquiry is more conventional. Once a percentage is affixed to the amount of sludge attributable to avgas production, it seeks to determine how much responsibility for that sludge the Government and Oil Companies each must bear.

#### A. The Government's uncontested liability

In this analysis where much is contested, but one of the few points of agreement is that the Government is wholly responsible for acid waste resulting from acid treating in the production of benzol. The parties have stipulated that 9 percent of Shell's waste sent to the McColl Site resulted from the acid treatment of benzol. The parties agree that Shell contributed at least 61 percent of the total waste at the McColl site.[12] Thus, the Government is wholly responsible for that 5.5 percent (61 percent of 9 percent) of the total waste at the McColl Site.

#### B. A minimum, but incomplete, estimate of the percentage of waste attributable to the avgas program

##### 1. Spent alkylation acid

The parties have agreed that the spent alkylation acid dumped at the McColl Site

ing into the refinery must leave the refinery after use.

**12.** There are three different estimates of the percentage amount of Shell's contribution, but 61 percent is the lowest estimate.

between late 1944 and early 1945 is entirely attributable to the avgas program. This constitutes approximately 12 percent of the total waste at the McColl Site.

### 2. Acid sludge

The Court heard expert testimony from Robert Anderson, a refinery operations expert, who testified that 13 percent of the sludge at the McColl Site can be attributed to the avgas program. For reasons more fully explained in Section C, *infra*, the Court is not satisfied that this represents a complete accounting of waste attributable to the avgas program, but it is quite useful in providing at least a minimum estimate.

### C. 100 percent of the non-benzol waste at the McColl Site is attributable to the avgas program

During the period in question, avgas was not the only product manufactured by the Oil Companies that required acid treating. The Oil Companies also produced motor fuel, kerosene, and lubricating oils, all of which were acid treated using spent alkylation acid.[13] Thus, in the course of its transformation from 98 percent "fresh" sulfuric acid to acid sludge, the acid assisted in the manufacture of both avgas and other products. Not surprisingly, the parties have fundamentally different views as to how much of the sludge is attributable to avgas and how much is attributable to other products.

### 1. The Oil Companies' "branding theory"

The Oil Companies contend that all alkylation acid that was in any way a part of the manufacture of avgas should be attributed completely to the avgas program.

The Government has, somewhat derisively, referred to this a the "branding theory"—that all sludge that has been involved in any way in the manufacture of avgas is to be "branded" as avgas sludge. Although this label is somewhat pejorative, it is precisely what the Oil Companies suggest.

**13.** Although some of these products were manufactured for the Government, to hold the Government liable on an arranger theory for sludge

### 2. The Government's "sponge theory"

The Government's theory can perhaps best be summarized by reference to an example used by their expert witness, Robert Anderson. Anderson testified that it is possible to determine what percentage of the acid sludge at the McColl Site is attributable to the avgas program by comparing the actual amount of sludge present with the amount that would have been present had the Oil Companies been using fresh acid instead of spent alkylation acid in the acid treatment of non-avgas products. He likened this increase to use of a wet sponge as opposed to a dry sponge:

> Let's consider [the sulfuric acid] to be a sponge. So we are soaking up all these bad molecules into the sponge, which is the acid water mixture. When that sponge becomes saturated with bad molecules, we've got to throw it away and we'll throw it away at McColl.
>
> Now, had we started with fresh acid, we would have started with a dry sponge. It would have become saturated and we would have thrown away a sponge at McColl . . .
>
> Now, we are starting not with fresh acid, but with spent acid, which means it's a damp sponge. It's already got some bad molecules in it. When we saturate that, we wouldn't be able to pick up as much because the sponge started out damp. So at the damp sponge starting point we need a bigger sponge.

(Tr. 558:13–559:2)

### 3. The Court's theory

Not surprisingly, the competing theories yield attribution results that are highly favorable to their proponents and come nowhere near adding up to 100 percent. The Court is not satisfied with either of the competing attribution theories proposed by the parties. The problem with the branding theory is that the acid was used—at least in part—to treat non-avgas products. The extent to which the waste problem at the McColl Site was aggravated due to this secondary use of the acid is ignored entirely by the branding theory.

attributable to these products is beyond the scope of this case. See September 18, 1995, Order at 19.

With respect to the Government's theory, the assumption is that the same amount of acid treating of non-avgas products would have occurred irrespective of the existence of the avgas program. This is utterly implausible. The evidence shows with unquestionable certainty that the acid-treating of avgas base stock in the amount demanded by the Government was going to happen as it in fact happened irrespective of what the Oil Companies did with the leftover spent alkylation acid. The Companies had massive surpluses of spent alkylation acid that they would not have had but for the avgas program. It is surely the case that much of the acid treating of non-avgas products, acid treating that often was not necessary but merely preferable, occurred solely because the acid was on hand and had to be put to some use or dumped.[14] It must also be true that greater quantities of non-avgas products subjected to acid treating were produced solely due to the presence of enormous excess quantities of spent alkylation acid and the increase in crude oil throughput at the refineries occasioned by the avgas program.

In sum, both the Oil Companies' and the Government's attribution theories operate on the premise that the proper starting point for the analysis is 100 percent attribution to the other party. The Government's theory then uses a "marginal waste created" (for lack of a better term) analysis in an attempt to determine the most favorable (i.e.smallest) attribution of waste to avgas.

Essentially, the Government's theory poses the question "Assuming (1) that all of the Oil Companies non-avgas use of acid would have occurred as it in fact did occur irrespective of the avgas program and (2) the sludge created from this amount of use is wholly attributable to the Oil Companies, how much extra waste did the acid treatment of avgas stocks create?"

The Oil Companies' theory poses the question "What percentage of the acid at the McColl Site ever went through the alkylation unit?"

In the Court's view, the proper question is "Given that all of the treatment of avgas stocks was going to occur as it in fact did occur irrespective of the Oil Companies' plans to make other products using spent alkylation acid, how much additional waste was created by the Oil Companies secondary use of the acid?" [15]

In the thousands of pages of documents, deposition transcripts, and trial transcripts submitted in this action, this question goes unanswered. However, one important fact is clear: the primary contaminant at the McColl Site is the sulfuric acid. This acid would be present in the same (or slightly greater) quantities irrespective of whether the Oil Companies had chosen to make secondary use of the acid for non-avgas products. Had the waste dumped at the McColl Site been purely spent alkylation acid, the Court (and presumably the parties) would readily attribute 100 percent of that waste to the avgas program. Without persuasive evidence that the secondary use of the spent alkylation acid substantially aggravated the waste cleanup problems at the McColl Site beyond what they would have been in the absence of that secondary use, the Court cannot say that the secondary use of the spent alkylation acid by the Oil Companies materially aggravated the waste treatment problems at the McColl Site.

■ Although the Court does not accept the Oil Companies' attribution theory, it does adopt the result sought by the Oil Companies and finds that 100 percent of the non-benzol waste at the McColl Site is attributable to the avgas program.

### D. The Government should bear 100 percent responsibility for waste attributable to the avgas program

■ After reviewing the evidence and applying such equitable factors as appear ap-

14. Indeed, the spent alkylation acid could not even have been recycled due to the unavailability of tank cars and/or regenration plants. *See* Sections D2 and D3, *infra*.

15. Essentially, this adopts the baseline starting point set forth by the Oil Companies and the "marginal waste created" method of analysis set forth by the Government. Instead of applying that analysis to avgas (as the Government advocates), the Court seeks to apply that analysis to non-avgas products.

propriate, the Court is convinced that the Government should bear total responsibility for any waste attributable to the avgas program for three reasons: (1) such a result simply places a cost of the war on the United States and thus on society as a whole, (2) the Oil Companies were unable to transport avgas waste to Richmond for recycling due to the unavailability of tank cars, and (3) the Oil Companies were unable to construct treatment plants due to the WPB's refusal to issue priorities. Each of these reasons appears to the Court to be a compellingly appropriate equitable factor to support the Court's conclusion.

### 1. The sludge and the cost of its cleanup were costs of World War II

This case is similar in many respects to *FMC Corp. v. U.S. Department of Commerce*, 786 F.Supp. 471 (E.D.Pa.1992), affirmed at 29 F.3d 833 (3rd Cir.1994). *FMC* involved a Virginia facility that manufactured high tenacity rayon for use in World War II. In 1982, inspections revealed that carbon bisulfide, a chemical used in the manufacture of high tenacity rayon, was present in the ground water in the vicinity of the plant. Consequently, the EPA began cleanup operations and notified FMC of its potential liability under CERCLA. In 1990, FMC filed suit, alleging that, as a result of the Government's activities during World War II, the United States was jointly liable with FMC as an "owner" and "operator" of the facility, and as an "arranger for disposal" of hazardous wastes there, within the meaning of 42 U.S.C. § 9607(a). In particular, FMC claimed that the Government became involved so pervasively in the facility that it effectively operated the plant along with American Viscose (the prior owner of the plant) and, accordingly, should share in the response costs. This argument prevailed in the District Court.

In affirming the District Court's finding of government liability,[16] the Third Circuit wrote:

> Furthermore, we point out that at bottom our result simply places a cost of the war on the United States, and thus on society

as a whole, a result which is neither untoward nor inconsistent with the policy underlying CERCLA.

29 F.3d at 846.

This statement is of equal force in the context of this allocation proceeding. As discussed above, the avgas program is one in which the degree of Government oversight was extraordinarily high. Indeed, had the Oil Companies' performance in the supply of avgas fallen short of requirements, the Government could have gone so far as to seize the plants. An allocation to the Government of liability for waste that is attributable to a war-time program is wholly consistent with the policy underlying CERCLA (as discussed in both the Third Circuit's *FMC* opinion and this Court's September 18, 1995, Order) and indeed simply places a cost of the war on the United States and thus on society as a whole. So long as responsibility being allocated is responsibility only for waste attributable to avgas production, it stands to reason that just as the American public stood to benefit from the successful prosecution of the war effort, so too must the American public bear the burden of a cost directly and inescapably created by the war effort, the production of avgas waste.

### 2. Tank cars were unavailable to the Oil Companies

Furthermore, even if the Court were of the view that, during the pendancy of the war, the Oil Companies were responsible for facilitating the proper disposal of avgas waste, the Court is convinced that the Oil Companies had no reasonable recourse to on-land dumping of the sludge due to the conduct of the WPB.

The Oil Companies have made a strong showing that this was indeed the case. In the years prior to the war effort, acid sludge was routinely transported in special lead-lined tank cars to the Shell Point facility in Richmond, California, for reprocessing into fertilizer. Between 1936 and 1939, when tank cars were available, the Oil Companies

**16.** In *FMC,* no allocation trial was held as the parties reached a settlement with respect to the allocation issues.

transported more than 86,000 tons of sludge to the Shell Point facility.

During the war, the lead-lined tank cars were needed by the Government for war purposes.[17] Thus, the cars were rarely available for the transportation of sludge to Shell Point.[18] Indeed, in his testimony before the Los Angeles Planning Commission in May 1942, Eli McColl stated that the reason he was applying for permit to dump waste at the McColl Site was that the Government would not allow his or the companies he represented to use tank cars to ship acid to northern California for use as fertilizer.

Between 1941 and 1943, the total amount of sludge transported to Shell Point dropped to less than 2,000 tons. As soon as tank cars again became readily available near the end of the war, the large-scale transportation of sludge to Shell Point via tank cars resumed. Given the pattern of transport both before and after the war, one can be sure that had lead-lined tank cars been available throughout the war years, the Oil Companies would have made use of them.

### 3. The Government repeatedly rebuffed the Oil Companies' attempts to obtain priorities to build regeneration plants.

From the beginning of the avgas program, the Government was aware that spent alkylation acid and acid sludge were produced in the manufacture of avgas and that increasing production of avgas would increase the amount of spent alkylation acid and acid sludge produced. The construction of new facilities to reprocess these avgas byproducts required WPB approval because without WPB approval the materials needed for construction could not be obtained. Decisions on the construction of such plants were made pursuant to the WPB's powers to allocate resources for the war effort.

During the war, Shell sought to build a spent alkylation acid decomposition plant in Houston. It sought to spend more than $1 million of its own funds to this end. On October 13, 1944, the Inorganic Acids Committee of the WPB rejected this request on the ground that when considering the need for fresh acid, an original sulfuric acid plant could be built with fewer resources than a spent acid decomposition plant.

Similarly, the stipulated facts establish than Texaco sought to build an acid reconcentrator to treat both spent acid and acid sludge as part of a larger proposal. The WPB eliminated this portion of the proposal on the ground that the acid requirements of Texaco could be provided from other sources.

After review of evidence of the denial of these two attempts to obtain priorities for the construction of treatment plants, as well the evidence submitted concerning the denial of the Tidewater request and the grant of the Stauffer request, it is clear that the Government's policy with respect to spent acid or acid sludge was not to grant priorities unless the plant was needed to provide fresh acid for use in the manufacture of avgas.

It is likely that this policy was that which best furthered the war effort. However, it came at the expense of the environment as, in combination with the unavailability of tank cars, it left the Oil Companies with no reasonable choice but to dump acid sludge. Simply put, the Government's war requirements created the waste and Government acts or omissions foreclosed the reasonable alternative methods of disposal (transportation via tank cars for recycling or construction of regeneration plants) of the waste. Having created the problem and foreclosed the possible solutions, the Government will receive a 100 percent allocation of waste attributable to the avgas program.

### E. The benefits the Oil Companies received from the avgas program do not warrant any offset in favor of the Government.

In addition to the profits the Oil Companies received under their avgas contracts, it

---

**17.** Ironically, the primary war-related use for the lead-lined tank cars appears to be the transportation of fresh sulfuric acid. A WPB publication dated December 9, 1944, stated that it was not just sulfuric acid that was in short supply, but that "tank cars are more critical than the product they carry."

**18.** For the months of December 1943 through May 1944, Shell and Union were able to obtain tank cars to ship sludge to Shell Point.

is clear from the evidence that the Oil Companies received economic benefits from the avgas program. Chief among these benefits was accelerated amortization of new facilities constructed during the war. This tax benefit allowed the Oil Companies to defer taxation.

■ The Government contends that this is an equitable factor to be counted against the Oil Companies. The Court disagrees. The extent of this and other benefits is hotly contested, but the existence of the Renegotiation Acts greatly simplifies the inquiry.

After the entry of the United States into World War II, Congress enacted the Renegotiation Act of 1942, or "First Renegotiation Act," 56 Stat. 245 (1942). This act called for the renegotiation of wartime contracts after the end of the war and provided for the retention by the Government or repayment to the Government of excessive profits realized by those who entered into contracts with the Government "whenever, in the opinion of the Secretary of a Department, the profits realized or likely to be realized ... may be excessive...." [19]

Seeking to make administration more uniform, Congress rewrote the Renegotiation Act on February 25, 1944 ("Second Renegotiation Act"). The Second Renegotiation Act established a central War Contracts Price Adjustment Board, consisting of officials from contracting agencies.

Pursuant to the regime set forth in the Renegotiation Acts, matters relating to profits from the contracts between the Government and the Oil Companies, termination costs, and all other issues concerning the instant contracts were settled between the parties in the late 1940s.

Although this renegotiation does not legally estop the Government from contending that the Oil Companies garnered excessive profits, it strongly indicates that this was not the case. To be sure, the Oil Companies are, by any measure, very successful business entities. However, the Court is ill positioned to attempt to trace the profitability of the Oil Companies back to their avgas contracts.

To the extent the Court considers it can make an independent determination of the profitability of the Oil Companies' participation in the avgas program, it appears that the Oil Companies did not excessively profit. The accelerated depreciation allowances granted the Oil Companies can be viewed as merely part of the price of seeking the hasty construction of new avgas facilities in wartime, facilities predominantly built with the Oil Companies' own money that would be far less expensive and better constructed if built in peacetime. Indeed, the tax advantages were available only to facilities built pursuant to Certificates of Necessity, which is to say that it had been determined that the construction, reconstruction, erection, installation, or acquisition of the facility was necessary in the interest of national defense. Furthermore, if a facility was determined to have full post-war value, it would not receive a Certificate of Necessity. Those facilities with limited post-war value would only receive Certificates of Necessity for costs in excess of post-war value.

The Government considered the tax advantages and other benefits received by the Oil Companies at least twice: once in the course of dealing during the war and once when the contracts were renegotiated shortly after the war. Each time, the Government determined that it was getting a fair deal, which is to say that the Oil Companies were not receiving undue benefits from the bargain at taxpayer expense. These determinations having been twice made by factfinders better situated both spatially and temporally than this Court, the Court will not revisit these determinations. In any event, the Government has failed to produce adequate evidence in these proceedings that it is entitled to an offset. Accordingly, the Court determines that the Government is not entitled to any offset based upon benefits received by the Oil Companies.

### CONCLUSION

In the final analysis, the Court has taken to heart as well as to mind the extraordinary problems here presented by World War II and this action. The Court has taken to heart and to mind the unusual mandate of

---

**19.** The benefits of the accelerated amortization afforded by a Certificate of Necessity were among the profits considered under the Renegotiation Acts.

**1030**

the Congress to "us[e] such equitable factors as the Court determines are appropriate."[20] In doing so, the Court has invoked "its moral as well as legal sense."[21]

CERCLA in its broad application discloses a long-delayed recognition by Congress that something drastic must be done about pollution of the earth and the atmosphere. The broad discretionary role assigned by Congress to judges presiding in allocation proceedings discloses recognition of the special need to avoid drastic and unfair imposition of liability on innocent parties.

In looking at the CERCLA statute, it appears to the Court that Congress must thereby have had in mind unusual cases such as this. At very least, Congress appears to have decided to allow the District Judge to recognize an unusual case which calls for an unusual disposition.

The benefits of avgas to the war effort were such that the United States was willing to incur almost any cost to obtain the maximum quantity and quality of avgas. Indeed, the Government paid substantially higher prices for gasoline produced by Government-built and -owned plants than it did to the party Oil Companies in order to meet its requirements. This willingness to absorb all costs irrespective of the impact on the final price of avgas was reflected in the both the "cost-plus" contracts for avgas and the existence of the AGRP. During World War II, neither the Government nor the Oil Companies foresaw that the method of disposal of acid waste to land at the McColl Site, which was done in a manner acceptable at the time, would years later be declared illegal and be subjected to a regulatory cleanup process.

Despite the size of the response costs, the Court is confident that, had the future CERCLA regime been foreseen by the parties, the Government would have agreed to pay for the costs of cleanup of the McColl Site (or any other unforeseen cost) in the blink of an eye, just as it agreed to reimburse the Oil Companies for extraordinary expenditures under the AGRP. At one level, this case can be viewed as a sort of extension of the regime that included cost-plus contracts, the AGRP plan, and the Renegotiation

Acts. This is a regime that sought to win a war at any dollar cost without allowing those whose cooperation was needed to make excessive profits. After the war, it was determined that the Oil Companies profits were not excessive but merely reasonable. The *post hoc* imposition of the costs here at issue more than fifty years after full performance of the contracts would surely alter that determination.

In conclusion, the war caused the problem and like myriad others the burden must rest on the United States, which is all of us. The United States won the war and all of us paid the costs at the time. This is another such cost merely long delayed.

Having found that (1) 100 percent of the benzol-related sludge at the McColl Site is attributable to the United States, (2) 100 percent of the non-benzol sludge at the McColl Site is attributable to the avgas program and (3) the United States is wholly liable for all sludge at the McColl Site that is attributable to the avgas program, the Court finds, pursuant to 42 U.S.C. § 9613(d), that the proper allocation of response costs between the Government and the Oil Companies is as follows: 100 percent allocation of liability to the United States and zero percent allocation of liability to the Oil Companies.

The foregoing factual recitals and determinations shall constitute the Court's Findings of Fact and Conclusions of Law. Each such finding of fact and conclusion of law has been considered and used by the Court in reaching its allocation of response costs.

Judgment will be entered accordingly.

IT IS SO ORDERED.

---

**20.**  42 U.S.C. § 9613(f)(1).

**21.**  *See United States v. R.W. Meyer, Inc., supra.*