# United States Court of Appeals
# for the Federal Circuit

———————

**SHELL OIL COMPANY, ATLANTIC RICHFIELD COMPANY, TEXACO, INC., AND UNION OIL COMPANY OF CALIFORNIA,**
*Plaintiffs-Appellants,*

v.

**UNITED STATES,**
*Defendant-Appellee.*

———————

2013-5051

———————

Appeal from the United States Court of Federal Claims in Consolidated Nos. 06-CV-0141 and 06-CV-1411, Judge Thomas C. Wheeler.

———————

Decided: April 28, 2014

———————

MICHAEL W. KIRK, Cooper & Kirk, PLLC, of Washington, DC, argued for plaintiffs-appellants. With him on the brief were VINCENT J. COLATRIANO and PETER A. PATTERSON.

STEPHEN C. TOSINI, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, DC, argued for defendant-appellee. With him on the brief were STUART F. DELERY,

Acting Assistant Attorney General, JEANNE E. DAVIDSON, Director, and FRANKLIN E. WHITE, JR., Assistant Director.

HILARY S. CAIRNIE, BakerHostetler LLP, of Washington, DC, for amicus curiae American Fuel & Petrochemical Manufacturers.  Of counsel were RICHARD B. RAILE and CHRISTOPHER H. MARRARO.

DANIEL M. STEINWAY, Baker Botts L.L.P., of Washington, DC, for amicus curiae Exxon Mobil Corporation. With him on the brief were WILLIAM S. FOSTER, JR., and MICHAEL PATRICK MCGOVERN.

———————

Before O'MALLEY, REYNA, AND WALLACH, *Circuit Judges.*

Opinion for the court filed by *Circuit Judge* WALLACH.

Dissenting opinion filed by *Circuit Judge* REYNA.

WALLACH, *Circuit Judge.*

The seventieth anniversary of the end of active United States participation in the Second World War will fall on September 2 of next year.  A nation of pragmatists, we tend to forget our history until necessity revives our memory.[1]  To resolve this contract claim by Shell Oil Co.

———————

[1]    "'There are no new problems in the law, only forgotten solutions[,] and the issues which arose yesterday will always arise again tomorrow.'"  Jeremy Rabkin & Ariel Rabkin, *Navigating Conflicts in Cyberspace: Legal Lessons from the History of War at Sea*, 14 Chi. J. Int'l L. 197, 198 (2013) (quoting Evan J. Wallach, *Partisans, Pirates, and Pancho Villa: How International and National Law Handled Non-State Fighters in the "Good Old Days" Before 1949 and That Approach's Applicability to the "War on Terror,"* 24 Emory Int'l L. Rev. 549, 552–53 (2010)).

("Shell"), Atlantic Richfield Co. ("ARCO"), Texaco, Inc. ("Texaco"), and Union Oil Co. of California ("Union Oil") (collectively, "the Oil Companies"), we must recall and place into its appropriate context the atmosphere of stark determination for victory at all costs, which drove our war effort after the Japanese Empire attacked the United States Naval Base at Pearl Harbor on December 7, 1941.

Each of the Oil Companies entered into contracts with the United States to provide high-octane aviation gas ("avgas") to fuel military aircraft as part of the national war effort ("the avgas contracts"). The production of avgas resulted in waste products such as spent alkylation acid and "acid sludge." The Oil Companies disposed of such acid waste by contracting with Eli McColl, a former Shell engineer, to dump the waste at real property in Fullerton, California ("the McColl site"). Over fifty years later, California and the United States obtained compensation from the Oil Companies pursuant to the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9601 et seq., for the costs of cleaning up the McColl site. The Oil Companies filed suit in the Court of Federal Claims, arguing the avgas contracts require the Government to indemnify them for the CERCLA costs. The Court of Federal Claims granted summary judgment in favor of the Government and denied the Oil Companies' motion for summary judgment. *Shell Oil Co. v. United States*, 108 Fed. Cl. 422 (Fed. Cl. 2013) ("*Shell Remand Decision*"). Because the avgas contracts require the Government to reimburse the Oil Companies for their CERCLA "charges," this court reverses with respect to breach of contract liability. The Court of Federal Claims correctly determined, however, that material factual disputes preclude granting summary judgment on damages, and that issue is accordingly remanded for trial.

BACKGROUND

## I. World War II and the Need for Avgas

Compared to other available fuels, high-octane avgas enabled aircraft to fly faster and higher, with improved rates of climb and higher payload carrying capacity. It was "the most critically needed refinery product" during World War II and was essential to the United States' war effort.[2]  J.A. 477 ¶ 4.  It was still a new technology in the late 1930s, however, and production was nowhere near sufficient for the massive quantities the United States and its allies would need to prosecute the war.

In 1942 and 1943, the Government, acting through the Defense Supplies Corporation ("DSC") entered into the avgas contracts with the Oil Companies.  The avgas contracts were long-term (primarily three-year) contracts to purchase avgas from the Oil Companies' refineries in Southern California, and enabled the Oil Companies to build the new refining facilities needed to produce the high levels of avgas vital to the war effort.

At the time the contracts were signed, the Government exercised substantial wartime regulatory control over almost every aspect of the petroleum industry.  It had authority to impose obligatory product orders on private companies, with noncompliance subject to crimi-

---

[2]    "At least since the transformation of navies from coal to diesel fuels in the early twentieth century availability of sources of petroleum products has been recognized by great powers as vital to their national interest." Evan J. Wallach, *The Use of Crude Oil by an Occupying Power as a Munition de Guerre*, 41 INT'L & COMP. L.Q. 287, 287 (1992); *see also* John W. Frey & H. Chandler Ide, *A History of the Petroleum Administration for War* 1 (1946), *available at* J.A. 431 ("World War II, from beginning to end, was a war of oil.").

nal sanctions or Government takeover. *See* Selective Training and Service Act of 1940, Pub. L. No. 76-783, ch. 720, § 9, 54 Stat. 885, 892 (1940). Facilities that accepted such obligatory product orders had to prioritize government military contracts above all other contracts. Act of May 31, 1941, Pub. L. No. 77-89, ch. 157, 55 Stat. 236 (1941). To the extent facilities relied on scarce raw materials, the Government could regulate supply chains to ensure continuing production. *Id.*; *see also* Second War Powers Act of 1942, Pub. L. No. 77-507, ch. 199, § 301, 56 Stat 176, 178 (1942) (authorizing the President to allocate any material or facility as necessary "in the public interest and to promote the national defense" whenever the country's defense needs would create a shortage in such materials or facilities).

The Government regulatory entities most relevant to the avgas contracts were (1) the Office of Petroleum Coordinator for National Defense ("OPC"), later replaced by the Petroleum Administration for War ("PAW"), and (2) the Office of Production Management ("OPM"), later run by and then replaced by the War Production Board ("WPB"). The WPB and PAW were created in January and December 1942, respectively. The WPB had primary authority over war procurement and production, and cooperated with the PAW to determine petroleum requirements and set national priorities for supplying the petroleum industry. Subject to the direction of the WPB, the PAW was charged with ensuring "adequate supplies of petroleum for military, or other essential uses" and "[e]ffect[ing] the proper distribution of such amounts of materials." Exec. Order No. 9276, 7 Fed. Reg. 10,091, 10,092 (Dec. 4, 1942). The "PAW told the refiners what to make, how much of it to make, and what quality." John W. Frey & H. Chandler Ide, *A History of the Petroleum Administration for War* 219 (1946), *available at* J.A. 1917.

Days after Pearl Harbor, the Government recognized the need to quickly mobilize avgas production, with the

OPC stating: "'It is *essential*, in the national interest that the supplies of all grades of aviation gasoline for military, defense and essential civilian uses *be increased immediately to the maximum*.'" J.A. 498–99 (quoting OPC Recommendation No. 16) (emphases added). Then-existing facilities could not produce the required levels of avgas, necessitating construction of additional facilities. However, the Government's substantial authority to control production only extended to *existing* facilities; it could not force companies to invest in new ones. *See*, *e.g.*, An Act to Expedite National Defense and for Other Purposes, Pub. L. No. 76-671, ch. 440, § 8(b), 54 Stat. 676, 680 (1940) (authorizing the Secretary of the Navy to nationalize and operate "any *existing* manufacturing plant or facility necessary for the national defense" when certain conditions were met) (emphasis added). A further stumbling block for the Government was that contracts with the Army and the Navy were subject to annual Congressional appropriations and thus limited to a one-year term. Such one-year contracts did not provide the long-term security necessary to justify the Oil Companies' investment in new facilities. In light of these limitations, the Government turned to the DSC, a government-owned corporation authorized to acquire critical and strategic materials, including avgas.

The DSC was a subsidiary of the Reconstruction Finance Corporation ("RFC"), another government-owned corporation. The designation in 1941 of avgas as a critical material enabled the RFC and its subsidiaries to buy, sell, and produce avgas and to make loans to companies to construct avgas production facilities. *See* Act of June 25, 1940, Pub. L. No. 76-664, ch. 427, § 5(1), 54 Stat. 572, 573 (codified at 15 U.S.C. § 606b (1940)). After purchasing avgas from the Oil Companies, the DSC resold it to the Army and the Navy at the national price established by the PAW (or its predecessor, the OPC).

Between 1942 and 1943, the Oil Companies entered into contracts with the DSC agreeing to sell vast quantities of avgas.[3] The contracts set forth a base price for each barrel of avgas, which was negotiated individually with each refiner based on the refiner's production costs. The base price was calculated with the goal of permitting an estimated profit of between 6% and 7%. Profits were further subject to the Renegotiation Act of 1942, which required contractors to repay excess profits to the Government. Pub. L. No. 77-528, ch. 247, § 403, 56 Stat. 226, 245 (1942).

Given the low profit margin, the avgas contracts contained various concessions to the Oil Companies. They were three-year contracts, thus providing some measure of certainty that the newly-constructed avgas production facilities would pay off over time. They also contained cost-allocation measures to limit the Oil Companies' risk in producing avgas. For instance, the agreed-upon base price of avgas was subject to adjustment depending on the Oil Companies' costs, including the price of crude and other raw materials, and the transportation of raw materials. The contracts also required the Buyer, DSC, to pay "any *now existing* taxes, fees, or charges . . . imposed upon [the Oil Companies] by reason of the production, manufacture, storage, sale or delivery of [avgas]." *E.g.*, J.A. 111 (1942 Shell contract) (emphasis added).

Relevant to the CERCLA charges in this case, another subsection required DSC to reimburse the Oil Companies for "any *new or additional* taxes, fees, or *charges*, . . .

---

[3]    At least some of the avgas contracts provided for loans to the Oil Companies to expand avgas production facilities, and required the Oil Companies to use "best efforts" to complete such construction as quickly as possible. *See, e.g.*, J.A. 97, 106 (1942 Shell contract) (promising to "maintain work on the expansion day and night").

which [the Oil Companies] may be required by any municipal, state, or federal law in the United States or any foreign country to collect or pay by reason of the production, manufacture, sale or delivery of the [avgas]" ("the new or additional charges provision"). *E.g.*, J.A. 111 (emphases added). These price-adjustment mechanisms ensured the Oil Companies would not be forced into loss-making activities by factors outside their control, such as the costs of materials and transportation, or unforeseen Government-imposed charges. The avgas contracts thus "assured the manufacturer of his costs, plus a fair but moderate profit." J.A. 1996 (statement of the Chief Legal Counsel for the PAW to the House Appropriations Committee).

During contract negotiation and the years that followed, the Government's primary concern was maximum avgas production. The Government directed the Oil Companies to "undertake extraordinary modes of operation which were often uneconomical and unanticipated at the time of refiners' entry into their [avgas] contracts." J.A. 514. For example, the PAW sometimes ordered companies to purchase raw materials outside their normal supply chain to achieve maximum avgas production. The Aviation Gasoline Reimbursement Plan required the Government to assume the costs of such uneconomical operations.

The arrangement between the Oil Companies and the Government was a cooperative endeavor in which the Oil Companies worked to achieve the Government's goal of maximizing avgas production and the Government assumed the risks of such increased production. The Oil Companies held up their end of the bargain: avgas production increased over twelve-fold from approximately 40,000 barrels per day in December 1941 to 514,000

barrels per day in 1945, and was crucial to Allied success in the war.[4]

## II. Avgas Production and Waste Products

Avgas consists of an ordinary gasoline base, blended with petroleum distillates and chemical additives. Alkylate is the most prevalent additive (at an amount of 25% to 40%) and is produced by alkylation, a process that uses 98% purity sulfuric acid as a catalyst. Because of the importance of avgas to the war effort, the WPB directed most available sulfuric acid to avgas production.

Spent alkylation acid is a byproduct of alkylation, and has a lower acid content than sulfuric acid. During the relevant time period, spent alkylation acid could be (1) reprocessed to its former 98% acid percentage, (2) used to process other petroleum products, like motor gasoline and kerosene, or (3) discarded as waste. Treating other petroleum products with spent alkylation acid further diluted its acid content until it became "acid sludge," which had acid levels of between 35% and 65%.

Predictably, the Oil Companies' success in increasing avgas production resulted in a corresponding increase in sulfuric acid consumption, which increased five-fold from 1941 to 1944.[5] Facilities to reprocess the spent alkylation

---

[4] After the war, the new avgas production facilities' usefulness was questionable; avgas consumption in the United States dropped to 70,000 barrels a day. Over time, however, the Oil Companies identified new uses for these facilities. The DSC was dissolved in 1945, and the RFC was dissolved in 1957, at which time the RFC transferred all relevant liabilities and obligations to the General Services Administration. *See* Reorganization Plan No. 1 of 1957, 71 Stat. 647 (1957).

[5] The increase in sulfuric acid use did not match the increase in avgas production because the Oil Companies

acid did not increase apace, however. The Government twice refused applications to construct new acid processing facilities, and one of the facilities that did exist failed to operate at its design capacity. Moreover, the scarcity of available railroad tank cars (and the WPB's refusal to make transportation of acid waste a priority) meant the Oil Companies were unable to transport acid sludge for reprocessing or other uses. *See* J.A. 565–66 (acid sludge could be used as fertilizer, but the scarcity of railroad tank cars prevented transporting acid sludge to the fertilizer plant). By late 1944 and 1945, the Oil Companies were unable to reuse the vast amounts of spent alkylation acid at their own refineries, and ultimately dumped much of it at the McColl site. Although dumping and burning acid waste were common before the war, the lack of reprocessing facilities and transportation options (and resulting bottleneck of acid waste) necessitated dumping and burning larger quantities of acid waste than ever before.

The Oil Companies dumped waste at the McColl site from 1942 until shortly after the war ended. Approximately 12% of the waste was spent alkylation acid, and another 82.5% was acid sludge resulting from chemical treatment of other petroleum products. The remaining 5.5% was acid sludge arising from treatment of Government-owned benzol, for which the Government was held liable in the CERCLA litigation. Only the non-benzol waste (i.e., the spent alkylation acid and the remaining acid sludge) is at issue in this case. Shell contributed most of the acid waste at the McColl site—at least 60%. ARCO contributed 10% to 20%, and also relied on other disposal methods, such as burning. Texaco dumped no waste until almost the end of the war, and instead burned

---

discovered a method of processing avgas that used far less sulfuric acid than had previously been necessary.

its acid sludge waste until late 1944. Some of Union Oil's sludge was reprocessed rather than dumped.

The Allies achieved victory in Europe on May 8, 1945. Japan officially surrendered on September 2, 1945. The United States Government no longer required huge quantities of avgas, and terminated the avgas contracts in 1945 or soon thereafter.

### III. McColl CERCLA Litigation

Over 45 years later, in 1991, the United States and California brought a CERCLA action against the Oil Companies to recover the costs of cleaning up the McColl site. The district court held the Oil Companies, among other parties, were jointly and severally liable for the acid waste they dumped at the McColl site, *United States v. Shell Oil Co.* (*Shell I*), 841 F. Supp. 962, 976 (C.D. Cal. 1993), but then allocated 100% of the cleanup costs to the Government as an "arranger" of the disposal, *United States v. Shell Oil Co.* (*Shell II*), 13 F. Supp. 2d 1018, 1030 (C.D. Cal. 1998); *see also* 42 U.S.C. § 9607(a)(3) (1994) (extending CERCLA liability to "any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances"). The Ninth Circuit affirmed the Oil Companies' liability, but reversed the allocation to the United States, holding the United States was not an "arranger" for the non-benzol acid waste. *United States v. Shell Oil Co.* (*Shell III*), 294 F.3d 1045, 1056, 1058 (9th Cir. 2002) ("No court has imposed arranger liability on a party who never owned or possessed, and never had any authority to control or duty to dispose of, the hazardous materials at issue.") (internal quotation marks and citation omitted).

Following remand, the district court transferred the Oil Companies' breach of contract counterclaim to the Court of Federal Claims pursuant to 28 U.S.C. § 1631. The Oil Companies voluntarily dismissed the transferred

Complaint without prejudice, exhausted their administrative remedies with the General Services Administration pursuant to the Contract Settlement Act of 1944 ("CSA"), Pub. L. No. 78-395, ch. 358, 58 Stat. 694 (1944) (codified at 41 U.S.C. § 113, et seq. (2006)), and filed a new Complaint in the Court of Federal Claims, seeking reimbursement for the CERCLA costs.

## IV. Court of Federal Claims Litigation

The Court of Federal Claims entered summary judgment in favor of the Oil Companies with respect to breach of contract liability and damages, holding the Government was required to reimburse the Oil Companies for 100% of their non-benzol CERCLA costs. *Shell Oil Co. v. United States*, 93 Fed. Cl. 439, 442 (2010); *Shell Oil Co. v. United States*, 93 Fed. Cl. 153 (2010). On appeal, this court found the presiding trial judge had a conflict of interest arising from his wife's stock ownership of Chevron Corp., the parent company of plaintiffs-appellants Texaco and Union Oil. *Shell Oil Co. v. United States*, 672 F.3d 1283, 1294 (Fed. Cir. 2012). Because the judge's failure to recuse himself was not harmless error, this court vacated and remanded with instructions that the case be reassigned to a different judge. *Id.*

On remand, the Court of Federal Claims granted summary judgment in favor of the Government. *Shell Remand Decision*, 108 Fed. Cl. at 422. It held there were three independent reasons why the Oil Companies were not entitled to reimbursement under the avgas contracts. First, it held the CERCLA costs incurred by the Oil Companies were not "charges" within the meaning of the new or additional charges provision in the avgas contracts. *Id.* at 434. Second, even if the contracts required reimbursement, the court found the Oil Companies released any valid claim when the contracts were terminated and "all other issues" were settled in the mid-to-late 1940s. *Id.* at 436. Finally, the court held that even if the

Oil Companies had otherwise valid indemnification claims based on the avgas contracts, the Anti-Deficiency Act barred such indemnification. *Id.* at 437.

The Court of Federal Claims denied the Oil Companies' motion for summary judgment for the additional reason that there were disputed facts over how much of the non-benzol waste at the McColl site was dumped "by reason of" the Oil Companies' "production, manufacture, sale or delivery" of avgas. *Id.* at 446–48.

The Oil Companies filed this timely appeal. This court has jurisdiction pursuant to 28 U.S.C. § 1295(a)(3) (2012).

DISCUSSION

On appeal, the Oil Companies challenge each of the three independent bases for the trial court's decision. They further contend there is no genuine dispute that they are entitled to recover 100% of the non-benzol CERCLA costs. Each argument is addressed in turn.

This court reviews the Court of Federal Claims' contract interpretation de novo. *Ford Motor Co. v. United States*, 378 F.3d 1314, 1316 (Fed. Cir. 2004). "Summary judgments also receive plenary review, the appellate tribunal applying the same criteria as did the trial court, with all justifiable factual inferences drawn in favor of the non-movant." *Id.* (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986)).

I. The Avgas Contracts Require Reimbursement of the Oil Companies' CERCLA Costs

The parties dispute the meaning of "charges" as it appears in the new or additional charges provision. The Oil Companies contend it is a broad indemnification provision designed to reimburse the Oil Companies for all Government-imposed "expenses" or "costs," including CERCLA response costs. The Government claims that the plain

language of the contract and other contemporaneous wartime contracts show that environmental cleanup costs are not "taxes, fees, or charges" as contemplated by the avgas contracts.

The avgas contracts promise reimbursement for "any new or additional taxes, fees, or charges" imposed on the Oil Companies, with certain exceptions not relevant here. *E.g.*, J.A. 111. The two paragraphs following this provision require the Government to pay "any now existing taxes, fees, or charges," and describe the Government's obligation in the event of a disagreement regarding the contractor's entitlement to an exemption. *E.g.*, J.A. 111–12. The avgas contracts provide (with some insignificant wording variations marked in brackets):

> Taxes.
>
> [(a)] Buyer shall pay in addition to the prices as established in [Sections IV and V] hereof ["Price and Payment" and "Price Escalation" clauses], any new or additional taxes, fees, or *charges*, other than income, excess profits, or corporate franchise taxes, which Seller may be required by any municipal, state, or federal law in the United States or any foreign country to collect or pay by reason of the production, manufacture, sale or delivery of the commodities delivered hereunder. Buyer shall also pay any such taxes on crude petroleum, or the transportation thereof, to the extent such taxes result in increased cost of the commodities delivered hereunder not compensated for by [Section V] hereof.
>
> [(b)] Buyer shall also pay in addition to the prices as established in [Sections IV and V] hereof, any now existing taxes, fees, or *charges* measured by the volume or sales price of the aviation gasoline delivered hereunder, imposed upon Seller by reason of the production, manufacture, storage, sale

or delivery of such gasoline, unless Buyer or Seller is entitled to exemption from a given tax, fee or *charge* by virtue of Buyer's governmental status; it being understood that Buyer now believes that both Buyer and Seller are entitled to such exemption.  Seller represents that the taxes, fees and *charges* referred to in this paragraph have not been included in its computation of costs on which the prices set forth in [Section IV] hereof are based.

[(c)] If in any case the parties cannot agree on the question as to whether or not Buyer or Seller is entitled to exemption from a given tax[, fee or *charge*] by virtue of Buyer's governmental status, the burden shall be upon Buyer to obtain a ruling in writing from a duly constituted and authorized governmental tax authority as to such exemption. Until such ruling is obtained Buyer shall pay the amount of the tax to Seller or to the appropriate tax collecting agency or make satisfactory arrangements with such tax collecting agency.

J.A. 111–12 (Shell contract, Apr. 10, 1942); J.A. 136–37 (Shell contract, May 1, 1943); J.A. 156–57 (Union Oil contract, Dec. 31, 1942, different section numbering); J.A. 179–80 (Union Oil contract, May 1, 1943); J.A. 207 (ARCO contract, Feb. 3, 1942, bracketed language in section (c), different paragraph labeling); J.A. 227–28 (ARCO contract, Feb. 20, 1943, bracketed language in section (c)); J.A. 254 (Texaco contract, Jan. 17, 1942, different language in subsection (b), different section numbering and paragraph labeling); J.A. 278–79 (Texaco contract, Feb. 8, 1943, different language in subsection (b)) (emphases added to disputed term).

"Reading the relevant clause as a whole, including the title, 'Taxes,'" the Court of Federal Claims found "it was plainly intended as a price-adjustment mechanism in the

event the Oil Companies were assessed additional or unanticipated *taxes* as a result of their avgas production." *Shell Remand Decision*, 108 Fed. Cl. at 432 (emphasis added). It accorded a "fairly narrow *tax-related* meaning" to "charges," interpreting it to mean "an encumbrance, lien, or other like financial burden or liability, especially one that relates to real property." *Id.* at 432–33. Such an interpretation, the trial court found, was consistent with the *noscitur a sociis* canon of interpretation, which "'counsels that a word [be] given more precise content by the neighboring words with which it is associated.'" *Id.* at 432 (holding that "'charges' [should] be 'given more precise content' by 'taxes' and 'fees'") (internal citation omitted).

The Court of Federal Claims found that multiple textual signals supported its narrow interpretation of "charges" as an encumbrance or lien: (1) the provisions are entitled "Taxes"; (2) they sometimes use the "umbrella identifier 'such taxes'" to refer to "'taxes, fees, or charges,'" *id.*; and (3) the exclusions from "'taxes, fees, or charges'" are "specific types of *taxes*," i.e., "'income, excess profits, or corporate franchise taxes,'" *id.*

On appeal, the Oil Companies argue that "charges" should be interpreted to mean "costs," including CERCLA costs. Appellants' Br. 20–21 (quoting, inter alia, Black's Law Dictionary 265 (9th ed. 2009) ("charge" means "[p]rice, cost or expense"); Black's Law Dictionary 311 (3d ed. 1933) ("charges" means "[t]he expenses which have been incurred, or disbursements made, in connection with a contract, suit, or business transaction")). According to the Oil Companies, the "new or additional taxes, fees, or charges" mentioned in the avgas contracts "clearly refer to different classes of *payments*," whereas encumbrances or liens (as the trial court interpreted "charges") do not refer to payment, "but rather to obligations or burdens often attached to property, usually for the purpose of securing a payment." Appellants' Br. 27.

The Government apparently agrees that the trial court's interpretation of "charges" is incorrect. It does not defend the Court of Federal Claims' interpretation of "charges" as "an encumbrance or lien," but instead states that "'charge' plainly connotes an amount paid to receive a privilege, product, or service." Appellee's Br. 29. It nonetheless argues charges cannot mean "costs," because another part of the avgas contracts uses "costs" in a different context. *Id.* at 23 (citing J.A. 111 ("Buyer shall also pay any such taxes on crude petroleum or the transportation thereof, to the extent such taxes result in increased *cost* of the commodities delivered hereunder.")). The Government contends this shows the parties "necessarily ascribed different meanings to the [words charges and costs]." *Id.*

It is unclear how the Government's proposed definition of charges as "an amount paid to receive a privilege, product, or service" differs from the plain meaning of "costs." *See* Black's Law Dictionary 397 (9th ed. 2009) (defining "cost" as "[t]he amount paid or charged for something; price or expenditure. Cf. EXPENSE"). Moreover, the Government's earlier arguments to the Court of Federal Claims conceded that the new or additional charges provision covers "new *costs* (with exceptions not pertinent here) imposed by authorities at any level of Government 'by reason of the production, manufacture or sale of [avgas].'"[6] Defendant's Motion to Dismiss the Complaint at 11, *Shell Oil Co. v. United States*, 93 Fed. Cl. 153 (2010) (No. 06-CV-141), ECF No. 7 (emphasis

---

[6] Even if the Government's proposed definition is not synonymous with "costs," it plainly includes CERCLA liability costs: "[T]he costs at issue *were* 'amount[s]' the Oil Companies 'paid to receive . . . service[s],' specifically the removal of hazardous substances from the McColl Site and remediation of their effects." Reply Br. 4.

added) (citation omitted).  In light of the common meaning of "charges" as "costs or expenses," and because the Government's own proposed definition accords with that meaning, this court interprets "charges" to mean "costs."[7]

The Government nevertheless argues that "charges" cannot include CERCLA costs, because "the word 'charge' appears nowhere in CERCLA, with the exception of its use in the context of 'person in charge,' 42 U.S.C. §§ 9603, 9604, and one discussion of a party 'sought to be charged' for 'natural resource damage.'  42 U.S.C. § 9607(f)(1)." Appellee's Br. 29.  The Government further observes that "the district court and appellate CERCLA cases underpinning this matter wholly lack the word 'charge'" (with exceptions not relevant here), and argues that "one need look no further than those cases to determine that the CERCLA response costs here have not been held to be 'charges' under any definition of that term."  *Id.* at 31.

Contrary to the Government's arguments, CERCLA costs are "charges" within the meaning of the relevant contract provision:  The avgas contracts promise reimbursement of "*any* new or additional . . . charges" the Government imposes on the Oil Companies "by reason of the production, manufacture, sale or delivery of [avgas]."

---

[7]     The dissent offers no different meaning.  It agrees with the trial court's application of the *noscitur a sociis* canon of interpretation, but does not appear to adopt the trial court's definition of "charges" as an encumbrance or lien.  *See* Dissenting Op. at 5.  By nevertheless concluding that the new or additional charges provision only covers "'Taxes' and tax-related items," *id.* at 6, the dissent gives no effect to the parties' inclusion of "charges" in that provision, *Metric Constr., Inc. v. Nat'l Aeronautics & Space Admin.*, 169 F.3d 747, 754 (Fed. Cir. 1999) ("Courts prefer . . . an interpretation of a contract that gives effect to all its terms and leaves no provision meaningless.").

*See*, *e.g.*, J.A. 111 (emphasis added). CERCLA is a federal law requiring responsible parties to pay the "*costs* of removal or remedial action," 42 U.S.C. § 9607(a)(4)(A) (emphasis added), and is thus a charge (i.e., cost) imposed by a federal law. The plain language of the new or additional charges provision thus requires the Government to indemnify the Oil Companies for CERCLA costs incurred "by reason of" the avgas contracts. The Government's search for exactitude in the CERCLA context is beside the point.

The Government argues that other textual indicators in the avgas contracts require limiting the scope of indemnification. For instance, it argues the new or additional charges provision only extends to charges imposed by "duly constituted and authorized governmental tax authorit[ies]." Appellee's Br. 35 (internal quotation marks and citation omitted) (modification in original). The "duly constituted . . . tax authority" language is located two paragraphs after the new or additional charges provision, and addresses when "the parties cannot agree . . . whether or not Buyer or Seller is entitled to exemption . . . by virtue of Buyer's governmental status" ("the exemption provision"). *See*, *e.g.*, J.A. 112. In such cases, "the burden shall be upon Buyer to obtain a ruling in writing from a *duly constituted and authorized governmental tax authority* as to such exemption." J.A. 112 (emphasis added).

The exemption provision is not relevant to the proper meaning of "charges." Only two of the contracts' exemption provisions (the ARCO contracts) refer to exemption from a "given tax, fee or charge," *e.g.*, J.A. 207; the remaining contracts refer only to "exemption from a given tax," *e.g.*, J.A. 112. The Government argues that the association in the ARCO contracts between "taxes, fees, or charges" and a "governmental tax authority" necessitates finding that "charges" is limited to taxes imposed by such bodies. The other six contracts, however, refer only to

*taxes* imposed by a "governmental tax authority," omitting fees and charges. To the extent any conclusion can be drawn from such language, the express exclusion of "fees or charges" in most of the contracts suggests that the parties recognized fees and taxes were not limited to taxes imposed by tax authorities.[8]

Moreover, no contrary conclusion could be reconciled with the new or additional charges provision at issue, which expressly applies to charges "required by *any municipal, state, or federal law in the United States or any foreign country*," and is clearly not limited to laws enforced by tax authorities. J.A. 111 (emphasis added). "We must interpret the contract in a manner that gives meaning to all of its provisions and makes sense." *McAbee Constr., Inc. v. United States*, 97 F.3d 1431, 1435 (Fed. Cir. 1996). It would make little sense to give determinative weight to a phrase that appears in a separate provision, in a minority of the contracts, and which contradicts the plain scope of the relevant language. After proposing a broad meaning of "charges" that includes CERCLA costs, the Government has not shown that other portions of the contract exempt the Government from indemnifying the Oil Companies for CERCLA costs imposed as a result of the avgas contracts.[9]

---

[8]    Nor does the Government contend the ARCO contracts should be construed differently than the other contracts that lack any reference to "charges" imposed by a tax authority.

[9]    The dissent places great weight on other "textual signals," including the title of the provision ("Taxes") and other portions of the text referring to "taxes, fees and charges" as "such taxes." *See* Dissenting Op. at 4–5. With respect to the former, the Supreme Court recently emphasized that it "has placed less weight on" headings and titles, especially when their "under-inclusiveness . . .

The Government nevertheless argues that indemnification is improper because the promise to pay for new or additional charges cannot encompass environmental liability. *See* Appellee's Br. 18 ("[T]he 'Taxes' clause lacks any language that could be construed to cover environmental remediation resulting from the oil companies' own decisions to dump acid waste."). It argues the avgas contracts are distinguishable from the World War II procurement contracts in *DuPont* and *Ford Motor Co.*, where this court required CERCLA indemnification. *See E.I. Du Pont de Nemours & Co. v. United States*, 365 F.3d 1367 (Fed. Cir. 2004); *Ford Motor Co.*, 378 F.3d at 1314. The indemnification provision in *DuPont*, for example, agreed "'to hold [DuPont] harmless against any loss, expense (including expense of litigation), or damage (including damage to third persons because of death, bodily injury or property injury or destruction or otherwise) of any kind whatsoever,'" as long as the loss resulted from performance under the contract and did not result from the negligence of DuPont corporate officers or representatives. *DuPont*, 365 F.3d at 1372 (citation omitted) (emphases removed). This court held *DuPont*'s "hold

---

is apparent." *Lawson v. FMR LLC*, 134 S. Ct. 1158, 1169 (2014). Because the "Taxes" heading omits the "fees" and "charges" that are also addressed by the new or additional charges provision, it is under-inclusive. It is "'but a shorthand reference to the general subject matter' of the provision, 'not meant to take the place of the detailed provisions of the text.'" *Id.* (quoting *Trainmen v. Balt. & Ohio R. Co.*, 331 U.S. 519, 528 (1947)). Moreover, aside from reciting the trial court's reasoning, the Government's briefing to this court did not rely on the title of the "Taxes" clause, nor on the references to "such taxes." Like the other portions of the contract discussed above, these textual indicators do not alter the plain scope of the new or additional charges provision.

harmless" provision "'show[ed] an intent to allocate all possible liabilities among the parties,'" and that "'CERCLA liability must be included among the future unknown liabilities which the parties allocated between themselves.'" *Id.* at 1373 (quoting *Elf Atochem N. Am. v. United States*, 866 F. Supp. 868, 870 (E.D. Pa. 1994)). The procurement contract in *Ford Motor Co.* required reimbursement of "allowable costs," including "'loss or destruction of or damage to property as may arise out of or in connection with the performance of the work under this contract,'" which this court held covered CERCLA liability. *Ford Motor Co.*, 378 F.3d at 1319.

The Government argues the avgas contracts contain neither a "hold harmless" provision, as in *DuPont*, nor an "allowable costs" provision, as in *Ford Motor Co.* As the Government concedes, however, "no 'special words' are required to create a promise of indemnification." Appellee's Br. 37 (quoting *Corbitt v. Diamond M. Drilling Co.*, 654 F.2d 329, 334 (5th Cir. 1981)). While it is true that the language in the avgas contracts differs from the contract language in *DuPont* and *Ford Motor Co.*, the relevant portions of the latter contracts also differed from one another. The proper question is whether the avgas contracts require the Government to pay the Oil Companies' CERCLA charges. Indemnification is required by the contracts' promise to pay for "any" government-imposed "charges" incurred "by reason of" the avgas contracts, and it is immaterial whether the new or additional charges provision is identical to the provisions in *DuPont* and *Ford Motor Co.*

The Government further argues the new or additional charges provision "does not contemplate indemnity for damages sounding in tort," and therefore cannot require CERCLA indemnification. Appellee's Br. 34. It relies on a statement in *DuPont* that "CERCLA evolved from the doctrine of common law nuisance." *DuPont*, 365 F.3d at 1373. Contrary to the Government's argument, *DuPont*

supports requiring CERCLA indemnification in this case. In *DuPont*, the Government argued the contract's "hold harmless" provision did not require reimbursement for CERCLA liability because CERCLA was not foreseeable at the time the contract was entered into. *Id.* This court rejected that argument, holding there was "no basis in the law for reading a limitation of foreseeability" into the contract, which "evidence[d] . . . that indemnification was available for all claims, foreseeable or not." *Id.* In the alternative, the *DuPont* court noted the Government's concession that nuisance liability would have been foreseeable, and observed that "CERCLA evolved from the doctrine of common law nuisance." *Id.*

As in *DuPont*, the avgas contract's new or additional charges provision requires reimbursement for even unforeseeable charges. The relevant provision in *DuPont* made no mention of new or additional charges, yet was nonetheless found to encompass unforeseeable CERCLA liability. The avgas contracts' promise to reimburse for "new or additional" charges must similarly extend to "all claims, foreseeable or not." *See id.* The *DuPont* court's alternative reasoning, based on nuisance liability, is irrelevant to the interpretation of the new or additional charges provision.

The Government offers other contemporaneous contracts as extrinsic evidence that the new or additional charges provision does not require CERCLA indemnification. It relies on Government contracts with Humble Oil and DuPont that contain both a "hold harmless" clause and a promise to reimburse for applicable taxes and charges. *See* J.A. 889–90, 898–99 (Humble Oil contract June 1, 1944); J.A. 845, 850 (DuPont contract Nov. 28, 1940). The Government argues these contracts provide "powerful evidence" that the new or additional charges provision "[was] never intended to provide the sort of indemnity that the oil companies seek." Appellee's Br. 26.

The Government has not established ambiguity in the relevant provision, in the absence of which it is improper to rely on extrinsic evidence. *See Coast Fed. Bank, FSB v. United States*, 323 F.3d 1035, 1040 (Fed. Cir. 2006) (en banc) ("If the provisions are clear and unambiguous, they must be given their plain and ordinary meaning, and we may not resort to extrinsic evidence to interpret them.") (internal quotation marks and citation omitted). The Government's argument is also unpersuasive since the taxes clauses in the DuPont and Humble contracts are not the same as the new or additional charges provision in the avgas contracts. The Humble and DuPont contracts promise reimbursement for "[a]ll applicable taxes, and other proper charges," J.A. 850, and "any applicable Federal, State or local taxes, assessments or charges," respectively. J.A. 889. They do not extend to "new or additional" government-imposed charges, and are, in fact, more analogous to the avgas contract's promise to pay for "any now existing taxes, fees, or charges." *See* J.A. 111. The Humble and DuPont contracts thus provide no reason to narrow the otherwise plain meaning of the new or additional charges provision.

Even assuming the taxes provision in the Humble and DuPont contracts extends to CERCLA liability, it is not coextensive with the "hold harmless" clause. The latter applies to losses arising from destruction of property, whether or not it is Government imposed, whereas the former applies to Government-imposed charges, whether or not loss to property was otherwise incurred. Because the taxes provision and the "hold harmless" provision require indemnification for different types of risks, the fact that both appear in the same contract does not render either provision "'superfluous[ ] or redundant,'" as the Government contends. *See* Appellee's Br. 28 (quoting *Medlin Constr. Grp., Ltd. v. Harvey*, 449 F.3d 1195, 1200 (Fed. Cir. 2006)).

Finally, to the extent extrinsic evidence is considered, it confirms that the parties intended "charges" to mean "costs." *See TEG-Paradigm Envt'l, Inc. v. United States*, 465 F.3d 1329, 1338 (Fed. Cir. 2006) (citing *Coast Fed. Bank*, 323 F.3d at 1040) ("Although extrinsic evidence may not be used to interpret an unambiguous contract provision, we have looked to it to confirm that the parties intended for the term to have its plain and ordinary meaning."). Communications between the parties used "charges" interchangeably with "costs," referring to, inter alia: (1) "the estimated *charge* for raw materials," (2) "[i]nvestment *charges*," (3) "interest *charges*," and (4) "overhead *charges*." J.A. 1955–56 (emphases added); *see also* J.A. 1964 (a letter from Standard Oil to the PAW stating "this proposed additional *charge* for tank car or tank truck shipping reflects quite accurately the additional *cost* to Seller and its Suppliers of tank car or tank truck shipping as compared with barge and tanker shipping") (emphases added).[10] This usage confirms that the parties intended the new or additional charges provision to extend to Government-imposed costs, such as CERCLA liability.

The context in which the contracts were formed simply further confirms that the new or additional charges provision requires reimbursement of the Oil Companies' CERCLA costs. *See Metric Constr., Inc. v. Nat'l Aeronautics & Space Admin.*, 169 F.3d 747, 752 (Fed. Cir. 1999) (quoting *Hol-Gar Mfg. Corp. v. United States*, 351 F.2d 972, 975 (Ct. Cl. 1965)) ("'[T]he language of a con-

---

[10] The United States objects to this and other material located at Joint Appendix pages 914 to 2003 and 2011 to 2026, which was not before the trial court in this case. Although the objected-to material is helpful for context and background, this court nowhere accords it determinative weight.

tract must be given that meaning that would be derived from the contract by a reasonably intelligent person acquainted with the contemporaneous circumstances.'"). World War II and the stark necessity of increased avgas production are the circumstances surrounding the formation of the avgas contracts. The Government was in a position of near-complete authority over existing refineries, but needed the Oil Companies' cooperation to construct *new* production facilities to meet the extraordinary demand for avgas. The Oil Companies agreed to the avgas contracts' low profits in return for the Government's assumption of certain risks outside of the Oil Companies' control. *See supra* Background Part I. The CERCLA charges in this case are one such risk. The Oil Companies could not have contemplated such CERCLA charges at the time they entered into the contracts; indeed, dumping the acid waste at the McColl site was expressly permitted. *See* J.A. 605 ¶ 492 (Eli McColl had a permit from the City of Fullerton to dump the waste.). These circumstances confirm that the new or additional charges provision must be interpreted to require reimbursement for the Oil Companies' CERCLA costs arising from avgas production. The Court of Federal Claims' holding to the contrary is accordingly reversed.

## II. The Court of Federal Claims Erred in Holding the Oil Companies' Contractual Claims Were Released

The Court of Federal Claims denied the Oil Companies' reimbursement claims for the additional reason that they were released when the avgas contracts were terminated and settled in the mid-to-late 1940s. The parties stipulated in the CERCLA litigation that the avgas contracts "were terminated in 1945 or, in the case of [ARCO], shortly thereafter. Matters relating to profits from these contracts, termination costs, and all other issues concerning these contracts were settled between the parties in the late 1940s." J.A. 640.

The Court of Federal Claims relied on *DuPont* and *Ford Motor Co.* in reasoning that the Oil Companies' claims did not survive the termination and settlement of the underlying avgas contracts. In both *DuPont* and *Ford Motor Co.*, this court held there was no release of the contractor's indemnification claim because the agreement terminating the underlying World War II contract expressly reserved future indemnification claims. *DuPont*, 365 F.3d at 1370; *Ford Motor Co.*, 378 F.3d at 1318. In this case, neither party could locate the Oil Companies' termination agreements, and the Court of Federal Claims reasoned that "the Oil Companies have offered no evidence or argument that this 'termination' and 'settle[ment]' differed in any material way from a general release." *Shell Remand Decision*, 108 Fed. Cl. at 436.

On appeal, the Oil Companies argue that "[t]he stipulation says nothing at all about whether the Oil Companies executed a release (general or otherwise) as part of [the] settlement, or if they did execute such a release, whether it encompassed or excepted future reimbursement claims for 'taxes, fees, or charges.'" Appellants' Br. 34. The Oil Companies contend this uncertainty is fatal to the trial court's finding of a general release, because the Government (as the defendant) bore "'the burden of proving the validity and applicability of a release,'" and failed to meet that burden. *Id.* at 35 (quoting *A.R.S. Inc. v. United States*, 157 Ct. Cl. 71, 76 (1962)).

The Government responds that the new or additional charges provision did not "remain in force after the expiration or termination of the contracts," and that "[s]uch permanence should not be inferred." Appellee's Br. 23; *see also id.* (quoting *Consumers Ice Co. v. United States*, 475 F.2d 1161, 1166–67 (Ct. Cl. 1973) (describing "a judicial reluctance to lock parties into a given set of rights and obligations for long or indefinite periods without some clear indication that this was actually intended by the parties")). The parties' stipulation is adequate to prove

release, the Government contends, because the stipulation "admits . . . that 'all other issues concerning these contracts were settled between the parties in the late 1940s.'" Appellee's Br. 43 (quoting J.A. 640 ¶ 609).

The Court of Federal Claims erred in holding the Government met its burden to prove release. "Once the facts of breach are established, the defendant has the burden of pleading and proving any affirmative defense that legally excuses performance." *Stockton E. Water Dist. v. United States*, 583 F.3d 1344, 1360 (Fed. Cir. 2009) (internal quotation marks and citation omitted); *see also* R. Ct. Fed. Cl. 8(c)(1) ("In responding to a pleading, a party must affirmatively state any avoidance or affirmative defense, including . . . release."). "[T]he burden of proving the validity and applicability of release is on the defendant." *A.R.S. Inc.*, 157 Ct. Cl. at 76. The two facts relied upon by the Government—termination and settlement of all claims—do not satisfy its burden to prove release of the Oil Companies' claims for CERCLA indemnification.

The Oil Companies brought these claims under the CSA, which is meant to ensure "speedy and equitable final settlement of claims *under terminated war contracts*." 41 U.S.C. § 101 (2006) (emphasis added), *repealed and replaced by* An Act To Enact Certain Laws Relating to Public Contracts, Pub. L. No. 111-350, § 6, 124 Stat. 3677, 3854 (Jan. 4, 2011); *see also id.* § 103(h) ("'[T]ermination claim' means any . . . claim under a terminated war contract . . . ."). The CSA allows post-termination indemnification claims, such as the Oil Companies' claims on the terminated avgas contracts, "'so long as the expenditure arose on account of the contractor's performance under the contract, and the expenditure is not otherwise excluded from payment by other provisions.'" *Ford Motor Co.*, 378 F.3d at 1320 (quoting *Houdaille Indus., Inc. v. United States*, 151 F. Supp. 298, 312 (Ct. Cl. 1957)); *see also id.* at 1319 ("[T]he CSA explicitly

contemplated later-arising claims, and set no period of limitations.").

*Houdaille*, for example, involved a World War II procurement contract in which the Government agreed to reimburse the contractor for, inter alia, its reasonable costs and expenditures resulting from contract termination. *Houdaille*, 151 F. Supp. at 300. The contract was terminated in 1946, and the contractor "paid $420,212.46 more in [unemployment insurance] contributions because of its experience under [the contract] than it would have if its contribution rate was based only on the operations of its three normal peacetime plants." *Id*. at 305. The *Houdaille* court rejected the Government's argument that "there [was] no authority" to reimburse costs "*after* the contract had expired," finding the expenses were reimbursable because they "arose on account of plaintiff's operation under the contract." *Id*. at 312. The court also held the contractor's indemnification claim was not barred by release, *id*. at 310, making it clear that a contract termination is not the same as a general release. In this case, the CERCLA costs for which the Oil Companies now seek indemnification arose, at least in part, from the production of avgas pursuant to the avgas contracts. The fact that the costs were not imposed until after the contracts were terminated does not bar the Oil Companies' CSA claims.

The Government nonetheless argues that the parties' settlement of all issues concerning the avgas contracts amounts to a general release of claims for reimbursement. It contends this case is distinguishable from *DuPont* and *Ford Motor Co.*, where the Termination Agreements expressly preserved the contractor's indemnification claims. *See DuPont*, 365 F.3d at 1373–74 (The Termination Supplement preserved all indemnification claims and "apparently included no termination or expiration date."); *Ford Motor Co.*, 378 F.3d at 1319 ("The Termination Agreement . . . includes all claims 'not now known' arising

from performance of the War Contract."). The Government maintains there is no indication that the settlement agreements in this case include any analogous promises to allow future indemnification claims. Just as the contract in *DuPont* was "no longer in effect, having been supplanted by the Termination Supplement," *DuPont*, 365 F.3d at 1373, the Government maintains the avgas contracts in this case are "no longer in effect," having been supplanted by the settlement agreements of "all other issues." Appellee's Br. 42–44. According to the Government, the terminated and settled avgas contracts cannot support any new indemnification claim; such a claim would have to be based on the settlement agreements, which are not in the record.

The parties' stipulation that "all other issues" were settled does not satisfy the Government's burden to prove a general release. *See* J.A. 640. A settlement between two parties may resolve all then-existing issues without discharging any and all obligations between the parties. *See* Restatement (Second) of Contracts § 284(1) ("A release is a writing providing that a duty owed to the maker of the release is discharged immediately or on the occurrence of a condition."). In *Ford Motor Co.*, for example, all issues had been settled, but not all rights were released; the parties agreed to allow future indemnification claims under the contract. 378 F.3d at 1319–20. It is the Government's burden to prove the settlement agreements released future claims under the avgas contracts, *A.R.S. Inc.*, 157 Ct. Cl. at 76, and the Government has failed to establish the content of those settlement agreements. The Government has not shown that the termination and settlement in this case amount to a general release of the Oil Companies' claims for reimbursement of new or additional charges. The Court of Federal Claims therefore erred in holding the Oil Companies' contract claims were released.

### III. The Court of Federal Claims Erred in Holding the Anti-Deficiency Act Barred the Oil Companies' Indemnification Claims

The final independent basis for the Court of Federal Claims' grant of summary judgment in favor of the Government was that any indemnification promise broad enough to encompass future CERCLA liability was an unenforceable violation of the Anti-Deficiency Act ("ADA").

The ADA provides, in relevant part:

No executive department or other Government establishment of the United States shall expend, in any one fiscal year, any sum in excess of appropriations made by Congress for that fiscal year, or involve the Government in any contract or other obligation for the future payment of money in excess of such appropriations *unless such contract or obligation is authorized by law.*

31 U.S.C. § 665 (1940) (now revised and codified at 31 U.S.C. § 1341) (emphasis added). "[A]bsent an express provision in an appropriation for reimbursement adequate to make such payment, [the ADA] proscribes indemnification on the grounds that it would constitute the obligation of funds not yet appropriated." *Cal.-Pac. Utils. Co. v. United States*, 194 Ct. Cl. 703, 715 (1971). In *Chase v. United States*, for example, the plaintiff sought damages under a building lease entered into with the Postmaster General. 155 U.S. 489, 490 (1894). The Supreme Court held the Postmaster General was authorized to enter into contracts on behalf of the United States only if "authorized by law, or . . . under an appropriation adequate to its fulfil[l]ment." *Id.* at 502. Because "[t]here is no claim that the lease in question was made under any appropriation whatever, . . . the only inquiry is whether the contract of lease was 'authorized by law,' within the

meaning of the [ADA]." *Id.* (holding the contract was not authorized by law).

The inquiry at the Court of Federal Claims likewise centered on whether the indemnification provisions at issue were "authorized by law." Before this court, however, the parties and amicus disagree on a preliminary question: whether the DSC was subject to the ADA in the first place. The Oil Companies argue that "DSC's contracts were not funded through appropriations," and contend the ADA thus does not apply. Appellants' Br. 39 (citing GAO, Reference Manual of Government Corporations, S. Doc. No. 86 (1945); J.A. 420 (DSC "did not receive direct annual appropriations.")). Amicus American Fuel & Petrochemical Manufacturers ("AFPM") elaborates that the DSC "was funded through borrowings and retained earnings, not through Congressional appropriations and had no borrowing limit."[11] AFPM Br. 20. The Oil Companies and AFPM therefore contend that the new or additional charges provision in the avgas contracts is not subject to the ADA.

This preliminary question—whether the DSC is subject to the ADA—was not raised before the Court of Fed-

---

[11]    The RFC, of which the DSC was a subsidiary, was capitalized with $500 million in capital stock subscribed by the United States, but was otherwise funded primarily by debt and retained earnings. J.A. 1429; *see also* 15 U.S.C. § 602 (1940). The RFC was authorized to charter a subsidiary "on such terms and conditions as [the RFC] may determine." 15 U.S.C. § 606b (1940). In August 1940, the RFC chartered the DSC, vesting it with authority "to borrow money and issue its secured or unsecured obligations therefore." J.A. 1447–48; *see also* J.A. 1440, 1443–44 (DSC borrowed over $6 billion and earned enough to repay approximately $4.8 billion back after the war.).

eral Claims, where both parties assumed the applicability of the ADA and only disputed whether the indemnification provision was *authorized* pursuant to the ADA. *See Shell Remand Decision*, 108 Fed. Cl. at 438. By failing to raise this issue below, the Oil Companies waived their argument that the ADA is inapplicable to the DSC. *See Harris Corp. v. Ericsson Inc.*, 417 F.3d 1241, 1263 (Fed. Cir. 2005). Like the Court of Federal Claims, this court assumes the ADA applies and limits the inquiry to whether the relevant indemnification provision was "authorized by law."

The Oil Companies argued before the trial court that the ADA did not bar recovery, because the new or additional charges provision was "authorized by" the First War Powers Act and implementing Executive Orders 9024 and 9001. The Court of Federal Claims held "that none of these sources provided the requisite ADA waiver that would have allowed the Government to indemnify the Oil Companies."[12] *Shell Remand Decision*, 108 Fed. Cl. at 437. On appeal, the Oil Companies contend the Court of Federal Claims wrongly required them to prove an ADA "waiver" when the ADA only requires *authorization* for the relevant provision. They maintain the authority granted to the President in the First War Powers Act, and delegated to the DSC through implementing Executive Orders 9024 and 9001, authorized the avgas contracts' new or additional charges provision.

Both parties agree that Title II of the First War Powers Act, enacted in 1941, granted the President the power

[12]    Before the Court of Federal Claims, the Oil Companies also contended that the requisite authorization was provided by the National Defense Act of 1916 and a June 1941 amendment to the charter of the DSC, *Shell Remand Decision*, 108 Fed. Cl. at 437, but do not raise these arguments on appeal.

to "authorize any department or agency" to enter into contracts that would otherwise violate the ADA, "whenever he deems such action would facilitate the prosecution of the war." Pub. L. No. 77-354, ch. 593, § 201, 55 Stat. 838, 839 (1941). The parties disagree, however, whether the President delegated this authority to the DSC in Executive Orders 9024 and 9001. In Executive Order 9024, President Roosevelt invoked the "authority vested in [him] by the Constitution and statutes of the United States," to establish the WPB and grant the WPB Chairman the power to, inter alia, "[d]etermine the policies, plans, procedures, and methods of the several Federal departments, establishments, and agencies in respect to war procurement and production, including purchasing, contracting, specifications, and construction." 7 Fed. Reg. 329, 330 ¶ 2(b) (Jan. 17, 1942). In a February 13, 1942, letter, the WPB Chairman then delegated to the OPC the authority "to determine . . . the price at which [avgas] is to be purchased, the capacity of the particular refiner to perform and the technical details of the particular contract," and delegated to the DSC the authority "to determine . . . the other terms and the form of such [avgas] contracts." J.A. 400.

By invoking authority from the "statutes of the United States," Executive Order 9024 delegates to the WPB the authority under the First War Powers Act to authorize indemnification provisions otherwise barred by the ADA. Moreover, the Chairman's letter to the DSC delegating the authority to determine "the other terms and the form of such [avgas] contracts" transfers that authority to the DSC. Contrary to the Government's objection that Executive Order 9024 does not mention contracting, it clearly directs the WPB Chairman to direct "the policies, plans, procedures, and methods" with respect "to war *procurement* and production, including purchasing, contracting, specifications, and construction." This delega-

tion is sufficient to authorize the indemnification provisions at issue under the ADA.

Indeed, the *DuPont* court found that a similar provision in the CSA was sufficient to authorize otherwise prohibited indemnification agreements. The relevant portion of the CSA stated:

> Each contracting agency shall have authority, *notwithstanding any provisions of law other than contained in this chapter*, (1) to make any contract necessary and appropriate to carry out the provisions of this chapter; (2) to amend by agreement any existing contract, either before or after notice of its termination, on such terms and to such extent as it deems necessary and appropriate to carry out the provisions of this chapter; and (3) in settling any termination claim, to agree to assume, or indemnify the war contractor against, any claims by any person in connection with such termination claims or settlement.

41 U.S.C. § 120(a) (1946) (emphasis added). The CSA did not expressly mention the ADA, but this court nonetheless reasoned that the "bestowal of contracting authority 'notwithstanding *any* provisions of law other than contained in this chapter'" was sufficient to authorize indemnification pursuant to the ADA. *DuPont*, 365 F.3d at 1375. Similarly, although Executive Order 9024 does not expressly state that the Chairman of the WPB (and, in turn, the DSC) can expend unappropriated funds otherwise in violation of the ADA, it is a broad delegation of contracting authority that impliedly invokes the President's authority under the First War Powers Act to bypass the ADA's restrictions. The Court of Federal Claims therefore erred in holding that the ADA rendered the indemnification provision unenforceable.

The Government nevertheless argues the DSC was at all times subject to prior Executive Order 8512, which

stated: "No agency shall make expenditures or involve the Government in any contract or other obligation for the future payment of money in excess of the amount currently available therefor under the apportionments so approved or revised." Appellee's Br. 46 (quoting 5 Fed. Reg. 2,849 (Aug. 15, 1940)) (internal quotation marks omitted). Although Executive Order 9024 provides that all prior "conflicting" Executive Orders "are hereby superseded," the Government argues the terms of Executive Order 9024 do not conflict with Executive Order 8512, whose prohibition thus remained in effect. To the contrary, however, Executive Order 9024 delegates the President's general contracting authority to the WPB "[b]y virtue of the authority vested in [the President] by the . . . statutes of the United States." Such statutes include the First War Powers Act's authority to enter into contracts that would otherwise violate the ADA. Delegating authority to bypass the ADA conflicts with Executive Order 8512, which prohibited contracts in excess of then-current appropriations. Executive Order 8512 thus does not control in this case.

Because the new or additional charges provision was authorized by the First War Powers Act, as delegated to the DSC through Executive Order 9024 and the WPB Chairman's letter, there is no need to consider whether the President also delegated such authority under Executive Order 9001. The Court of Federal Claims' holding that the ADA prohibited reimbursement of new or additional charges is therefore reversed.

Each of the three independent bases for denying the Oil Companies' reimbursement claims has been reversed, making it appropriate to enter summary judgment in favor of the Oil Companies with respect to breach of contract liability. The sole remaining issue is whether the Court of Federal Claims correctly determined that genuine disputed facts prevented granting summary judgment with respect to damages.

IV. The Court of Federal Claims Correctly Held That
Disputed Facts Prevent Granting the Oil Companies'
Motion for Summary Judgment on Damages

The Court of Federal Claims found there were "factual questions" regarding "what portion of the non-benzol waste [(i.e., the spent alkylation acid and the non-benzol acid sludge)] was created 'by reason of' the avgas program." *Shell Remand Decision*, 108 Fed. Cl. at 448. On appeal, the Oil Companies argue this court should award 100% of their CERCLA costs on the ground that the Government is collaterally estopped from arguing that anything less than 100% of the non-benzol acid waste was due to the avgas contracts.

The Oil Companies rely on the decision of the district court in the CERCLA litigation, which found "that 100 percent of the non-benzol waste at the McColl Site is attributable to the avgas program." *Shell II*, 13 F. Supp. 2d at 1026. The Oil Companies argue the district court's attribution "finding is binding on the Government as a matter of issue preclusion." Appellants' Br. 56 (quoting *United States v. Mendoza*, 464 U.S. 154, 158 (1984) ("[O]nce a court has decided an issue of fact or law necessary to its judgment, that decision is conclusive in a subsequent suit based on a different cause of action involving a party to the prior litigation.")). The district court's finding was not final, however, but rather was reversed by the Ninth Circuit. *Shell III*, 294 F.3d at 1048–49. The Ninth Circuit instead held the Government was not an "arranger" for the non-benzol waste, and thus did not reach the question of how much non-benzol waste was attributable to the avgas program. *Id.* The final decision in *Shell III* thus did not resolve the attribution issue and cannot serve as the basis for issue preclusion. *See Laguna Hermosa Corp. v. United States*, 671 F.3d 1284, 1288 (Fed. Cir. 2012) (issue preclusion requires, inter alia, that "resolution of the issue was essential to a

final judgment in the first action") (internal quotation marks and citations omitted).

The Oil Companies contend the district court's non-benzol attribution analysis *was* necessary to the Ninth Circuit's holding because the Ninth Circuit affirmed the district court's apportionment analysis with respect to the benzol waste. This argument confuses the district court's *attribution* holding (based on the factual question of how much acid waste was caused by the avgas program) with its *apportionment* holding. In the latter, the district court identified multiple reasons why 100% of the waste for which the Government was an "arranger" (both the benzol *and* non-benzol waste) should be equitably apportioned to the Government: (1) it would properly place the costs of war on society as a whole, and (2) it would reflect the Government's role in limiting reprocessing facilities and access to tank cars. *Shell II*, 13 F. Supp. 2d at 1027. The Ninth Circuit affirmed this apportionment analysis with respect to the benzol waste.

This equitable apportionment holding is distinct from the issue of attribution relevant in this case: how much of the acid waste dumped at the McColl site was "by reason of" the avgas program. The Ninth Circuit did not rely on or incorporate the district court's attribution holding with respect to the non-benzol waste, and instead stated "[t]he undisputed facts indicate that the Oil Companies . . . dumped acid waste *from operations other than avgas production* at the McColl site." *Shell III*, 294 F.3d at 1062 (emphasis added). In short, the prior CERCLA litigation does not preclude the Government from challenging the amount of acid waste attributable to the avgas contracts.

Absent collateral estoppel, the Oil Companies do not contest the trial court's finding of a genuine dispute regarding how much of the acid waste at the McColl site resulted from the avgas contracts, nor does this court discern any error. *See, e.g.*, J.A. 569 ("Kerosene and

lubricating oils were also acid treated" and "produced acid sludge."); J.A. 572 (The McColl site "contains acid sludge resulting from the treatment of civilian and military petroleum products."). The case is remanded for the Court of Federal Claims to determine how much acid waste at the McColl site was "by reason of" the avgas contracts.

CONCLUSION

For the foregoing reasons, this court reverses the Court of Federal Claims' grant of summary judgment with respect to breach of contract liability, and remands for a trial on damages.

**REVERSED AND REMANDED**

# United States Court of Appeals
# for the Federal Circuit

―――――――――

**SHELL OIL COMPANY, ATLANTIC RICHFIELD COMPANY, TEXACO, INC., AND UNION OIL COMPANY OF CALIFORNIA,**
*Plaintiffs-Appellants,*

**v.**

**UNITED STATES,**
*Defendant-Appellee.*

―――――――――

2013-5051

―――――――――

Appeal from the United States Court of Federal Claims in Consolidated Nos. 06-CV-0141 and 06-CV-1411, Judge Thomas C. Wheeler.

―――――――――

REYNA, *Circuit Judge*, dissenting.

The majority concludes that a "Taxes" clause in several contracts for high-octane aviation gas ("avgas") should be broadly interpreted to require the United States to indemnify the Oil Companies for a CERCLA judgment covering restoration efforts of the McColl acid waste site more than fifty years after the completion of the contracts. I do not interpret the "Taxes" clause as a general indemnification clause that captures production-related costs. For this and the other reasons set forth below, I respectfully *dissent*.

## I.

This appeal arises following the Oil Companies' failure to recover the McColl site clean-up costs through the CERCLA litigation that took place in California. The CERCLA regime allows a party that is financially responsible for the clean-up costs of environmental contamination to seek contribution from other responsible parties. 42 U.S.C. § 9613(f)(1). District courts thus have broad discretion to resolve contribution claims "using such equitable factors as [they] determine[] are appropriate." *Id.*; *see also Boeing Co. v. Cascade Corp.*, 207 F.3d 1177, 1187 (9th Cir. 2000) (noting that CERCLA "gives district courts discretion to decide what factors ought to be considered, as well as the duty to allocate costs according to those factors"). After failing to achieve a satisfactory outcome under CERCLA's equitable considerations, the Oil Companies now seek recovery through a different avenue—a breach of contract action. In doing so, they breach the four corners of their avgas contracts by asking this court to interpret the "Taxes" clause as a catch-all indemnification provision. Such an interpretation, in my view, has no basis in the plain language of the clause or the overall scope of the contract. I would therefore affirm the decision of the Court of Federal Claims and hold that the "Taxes" clause was intended by the parties to be nothing more than a price-adjustment mechanism covering additional or unanticipated tax-related burdens assessed by reason of avgas production.[1]

"Contract interpretation is a question of law, which [the court] review[s] without deference." *1st Home Liqui-*

---

[1] I do not interpret the "Taxes" clause as allowing the Oil Companies to recover their CERCLA costs, I do not address the Court of Federal Claims's conclusion that recovery is also precluded by general release and the Anti-Deficiency Act.

*dating Trust v. United States,* 581 F.3d 1350, 1355 (Fed. Cir. 2009); *Teg-Paradigm Envtl., lnc. v. United States*, 465 F.3d 1329, 1336 (Fed. Cir. 2006). "In the case of contracts, the avowed purpose and primary function of the court is the ascertainment of the intention of the parties." *Alvin Ltd. v. U.S. Postal Serv.*, 816 F.2d 1562, 1565 (Fed. Cir. 1987). Contract interpretation begins with the language of the written agreement, which must be given "[its] ordinary meaning unless the parties mutually intended and agreed to an alternative meaning." *Harris v. Dep't of Veterans Affairs*, 142 F.3d 1463, 1467 (Fed. Cir. 1998). We may not resort to extrinsic evidence "to create an ambiguity where a contract was not reasonably susceptible of differing interpretations at the time of contracting." *Metric Constructors, Inc. v. Nat'l Aeronautics & Space Admin.*, 169 F.3d 747, 752 (Fed. Cir. 1999); *see also Coast Fed. Bank, FSB v. United States*, 323 F.3d 1035, 1038 (Fed. Cir. 2004) (en banc).

Under the "Taxes" clause of the avgas contracts, the Government agreed to reimburse the Oil Companies for "any new or additional taxes, fees, or charges" that may be imposed "by reason of" the production, sale, and delivery of avgas. Shell Oil Company's contract, dated April 10, 1942, is representative of all the avgas contracts at issue here and provides:

XII. <u>Taxes</u>

    a) Buyer shall pay in addition to the prices as established in Sections IV and V hereof, *any new or additional taxes, fees, or charges*, other than income, excess profits, or corporate franchise taxes, which Seller may be required by any municipal, state, or federal law in the United States or any foreign country to collect or pay by reason of the production, manufacture, sale or delivery of the commodities delivered hereunder.

> Buyer shall also pay any such taxes on
> crude petroleum, or the transportation
> thereof, to the extent such taxes result in
> increased cost of the commodities delivered
> hereunder not compensated for by Section
> V hereof.

J.A. 111-12 (Shell Oil Co. Contract, Apr. 10, 1942) (emphasis added).

The majority's conclusion that CERCLA liability is covered by this clause hinges on an isolated interpretation of the word "charges." The majority engages in a lengthy discussion of the plain meaning of "charges" and concludes that it is synonymous with "costs." Maj. Op. at 17-19. The majority then proceeds to hold that the "Taxes" clause requires the Government to reimburse the Oil Companies for costs of any and all type, regardless of how they were incurred, as long as those costs arise "by reason of" the production and delivery of avgas.

Such an interpretation ignores the contractual character and import of the "Taxes" clause. When read as a whole, the contract signals that the parties, at the time they entered into the contract, intended the "Taxes" clause to be read as a price-adjustment mechanism covering unexpected tax-related burdens. First, the clause is titled "Taxes." Second, the clause uses the term "such taxes" several times to refer back to the broader category of "taxes, fees, or charges." Third, the specific exclusions from "taxes, fees, or charges" are all income and related taxes, including "income, excess profits, [and] corporate franchise taxes." Finally, the clause provides that the payment of "new or additional taxes, fees, or charges" will be in addition to the prices established in the "Price and Payment" (Section IV) and "Price Escalation" (V) clauses of the contract. The term "charges" should thus be interpreted consistently and in harmony with the broader

operation of the "Taxes" clause as a price-adjustment mechanism.

The majority summarily dismisses these textual signals in favor of an isolated and overly-broad interpretation of the singular term "charges" to conclude that "[t]he plain language of the new or additional charges provision" must encompass CERCLA liability. Maj. Op. at 19. In doing so, the majority ignores the trial court's use of the *noscitur a sociis* canon of interpretation, which "is just an erudite (or some would say antiquated) way of saying what common sense tells us to be true: '[A] word is known by the company it keeps.'" *James v. United States*, 550 U.S. 192, 222 (2007) (Scalia, J., dissenting) (alteration in original) (quoting *Jarecki v. G.D. Searle & Co.*, 367 U.S. 303, 307 (1961)). Indeed, contract terms must be construed, not in isolation, but as a whole and in a way that gives effect to the surrounding context. *NVT Techs., Inc. v. United States*, 370 F.3d 1153, 1159 (Fed. Cir. 2004) (noting that a contract must "be considered as a whole and interpreted so as to harmonize and give reasonable meaning to all of its parts"); *Metric Constructors*, 169 F.3d at 752 ("Before arriving at a legal reading of a contract provision, a court must consider the context and intentions of the parties."). "The context and subject matter of a contract may indicate that an ordinary word or phrase has an unusual meaning in a given sentence." 11 Richard A. Lord, Williston on Contracts § 32:6 (4th ed. 1999 & Supp. 2009). "[I]t is questionable whether a word has a meaning at all when divorced from the circumstances in which it is used." E. Allen Farnsworth, Contracts 454 (4th ed. 2004). Here, the majority's interpretation ignores the plain meaning of the text, fails to give harmony to the contracts as a whole, and is overall unreasonable.

For example, the majority dismisses, in a footnote, any reliance on the title of the clause ("Taxes") as evidence of the clause's fairly narrow *tax-related* meaning. Maj. Op. at 20 n.9. The majority notes that the Supreme

Court tends to "place[] less weight on" captions, headings and titles when construing statutory provisions. *Id.* (quoting *Lawson v. FMR LLC*, No. 12-3, 2014 WL 813701, at \*10 (U.S. Mar. 4, 2014)). This principle, which is often used when "the [statutory] text is complicated and prolific," nevertheless recognizes that a heading can be a helpful "'short-hand reference to the general subject matter' of the provision." *Lawson*, 2014 WL 813701, at \*10 (quoting *Trainmen v. Baltimore & Ohio R. Co.*, 331 U.S. 519, 528 (1947)). Hence, Supreme Court precedent supports a finding that the parties intended for the "general subject matter" of this clause to cover "Taxes" and tax-related items.

The majority rejects the Government's comparison of the "Taxes" clause to the terms of other contemporaneous contracts as an improper reliance on extrinsic evidence in the absence of an "established ambiguity." Maj. Op. at 24. At the same time, the majority itself informs its broad interpretation of the "Taxes" clause by heavily relying on extrinsic evidence. As the majority notes:

> World War II and the stark necessity of increased avgas production are the circumstances surrounding the formation of the avgas contracts. The Government was in a position of near-complete authority over existing refineries, but needed the Oil Companies' cooperation to construct *new* production facilities to meet the extraordinary demand for avgas.

Maj. Op. at 26 (emphasis original). The majority concludes that "[t]hese circumstances confirm that the new or additional charges provision must be interpreted to require reimbursement for the Oil Companies' CERCLA costs arising from avgas production." *Id.* The majority thus justifies its broad interpretation of the "Taxes" clause not on the language of the clause itself but on a weighing of the equities in light of the wartime circum-

stances, subject matter not in the record before us and certainly not reflected by the terms of the contract. I believe that reliance on unsupported historical and social anecdotes should not trump the plain meaning of the contract terms and, in this case, transform a straightforward "Taxes" clause into a catch-all indemnification provision. *See, e.g.*, *City of Oxnard v. United States*, 851 F.2d 344, 347 (Fed. Cir. 1988) (noting that the contract language is the best evidence of the parties' intent and should take precedence over any "subjective intent of one of the parties, if contrary to the unambiguous and reasonable text of the written contract").

## II.

Even if the "Taxes" clause could be interpreted to encompass certain non-tax-related costs, the majority does not adequately explain why the clause should be extended to indemnify CERCLA liability. As we have previously noted:

> In order for a pre-CERCLA indemnification clause to cover CERCLA liability, courts have held that the clause must be either [1] specific enough to include CERCLA liability or [2] general enough to include any and all environmental liability which would, naturally, include subsequent CERCLA claims.

*E.I. Du Pont de Nemours & Co. v. United States*, 365 F.3d 1367, 1373 (Fed. Cir. 2004) (quoting *Elf Atochem N. Am. v. United States*, 866 F. Supp. 868, 870 (E.D. Pa. 1994)). As we noted in *DuPont*, "CERCLA evolved from the doctrine of common law nuisance" and is thus similar to tort-based liability claims. *DuPont*, 365 F.3d at 1373. CERCLA gives the President broad power to direct the Government to clean up a hazardous waste site itself or to command the responsible parties to do so. *See Cooper Indus., Inc. v. Aviall Servs., Inc.*, 543 U.S. 157, 160 (2004). Responsible parties may thus satisfy their CERCLA

liability by means other than cash payments to governmental entities. Had the Oil Companies self-performed the clean-up efforts at the McColl Site, they would have even less of a basis to argue that the clean-up costs are encompassed by the "Taxes" clause because the clause covers only "charges" the contractor was required by a government entity "to collect or pay."

Here, nothing in the plain language of the avgas contracts indicates that the parties intended for the "Taxes" clause to "allocate [generally] all possible liabilities" among themselves, much less to allocate specifically the risks of environmental liability. *Id.* The "Taxes" clause is devoid of any language that resembles the broad indemnification provisions considered by our decisions in *DuPont* and *Ford Motor Co. See DuPont.* 365 F.3d at 1367; *Ford Motor Co. v. United States*, 378 F.3d 1314, 1314 (Fed. Cir. 2004). In *DuPont*, we held that the Government's agreement "to hold [DuPont] harmless against any loss, expense . . . or damage . . . *of any kind whatsoever*" was sufficient to include CERCLA liability. 365 F.3d at 1372 (emphasis added). In *Ford Motor Co.*, we similarly held that CERCLA liability was covered by a provision requiring reimbursement of all "allowable costs," including "*loss or destruction of or damage to property* as may arise out of or in connection with the performance of the work under this contract." 378 F.3d at 1319 (emphasis added). No such provision exists in this case.

Yet, the majority's entire analysis rests on the conclusion that a term requiring payment of "charges" or "costs" is sufficient to require broad indemnification. Maj. Op. at 22. But the "Taxes" clause lacks any reference to concepts indicating that the parties intended to enter into a broad indemnity provision; terms like "loss," "damage," "liability," "destruction," "indemnify," "hold harmless," and "injury" are nowhere to be found. Although I agree with the majority that no "special words" are required to give effect to a promise of indemnification, *id.*, that does not

mean that the contract can be devoid of any objective indicia of the parties' intent to generally allocate liability between them. *See, e.g.*, *City of Oxnard*, 851 F.2d at 347. In my view, the avgas contracts lack any evidence of such intent.

If history serves a purpose in this case, it is to show that in the 1940s, as today, avgas production results in byproducts, some of which are wastes. Waste created in the production of petrochemicals represents a cost on the producer, in this case the Oil Companies. That the contracts are silent on who bears the cost related to the production and disposal of avgas-related byproducts indicates that the parties intended the cost to be borne by the Oil Companies.

Indeed, the plaintiffs in this case are sophisticated companies that "surely would know how to [negotiate and] draft broad hold harmless indemnification clauses extending in perpetuity if that were their intent," even during wartime. *Shell Remand Decision*, 108 Fed. Cl. at 425. Our previous decisions in *DuPont* and *Ford Motor Co.* provide evidence of this very fact. The Oil Companies' best opportunity to recover their clean-up costs from the Government was through the CERCLA litigation in California, and they should not now be allowed to recover by fitting a square peg into a round hole. The majority errs by interpreting a straightforward "Taxes" clause as a catch-all indemnification provision. Therefore, I must *dissent*.